Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/05/2021 08:11 AM CST

State of Nebraska, appellee, v.
Alan E. Stack, appellant.
___ N.W.2d ___

Filed November 13, 2020.    No. S-19-833.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Verdicts: Insanity: Appeal and Error.** The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding.

3. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

4. **Motions to Dismiss: Directed Verdict: Waiver: Appeal and Error.** A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence.

5. **Homicide: Intent.** Both second degree murder and voluntary manslaughter involve intentional killing; they are differentiated only by the presence or absence of the sudden quarrel provocation.

6. **Homicide: Words and Phrases.** A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.

7. **Homicide: Intent.** It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent.

8. **Homicide: Words and Phrases.** A sudden quarrel does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.

9. **Insanity: Proof.** The insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong.

10. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

11. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

12. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Sarpy County: Stefanie A. Martinez, Judge. Affirmed.

Gregory A. Pivovar, and, on brief, John P. Hascall, Deputy Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Alan E. Stack appeals his convictions and sentences for second degree murder and use of a deadly weapon to commit a felony. Circumstantial evidence presented at Stack's bench trial linked him to the murder of a woman with whom he lived. In this appeal, Stack challenges the sufficiency of the evidence and the district court's finding that the evidence supported a conviction of second degree murder, rather than sudden quarrel manslaughter. He also claims that the district court erred in rejecting his insanity defense and imposed excessive sentences. Finding no merit to Stack's contentions, we affirm.

## I. BACKGROUND

### 1. Procedural Overview

On November 16, 2017, family members found Beverley Diane Bauermeister dead in her home. Severe head trauma was evident. Bauermeister's elderly mother was in another room, alive but immobile. Stack, a heavy drinker, was living with Bauermeister and her mother at the time of Bauermeister's death.

Stack was ultimately charged with second degree murder; abuse of a vulnerable or senior adult; and use of a deadly weapon, other than a firearm, to commit a felony. Stack filed a notice of intent to rely on the insanity defense. He claimed that a mental defect impaired his mental capacity so that he did not understand the nature and consequences of his actions and that he did not have the ability to form the requisite intent.

At the subsequent bench trial, the State presented circumstantial evidence that tied Stack to the crimes charged. At the close of the State's case, Stack made a motion to dismiss all counts, which the district court overruled. Stack proceeded to present evidence in his defense, including testimony in support of his insanity defense. The State presented additional evidence opposing Stack's defense.

Once the parties rested, the district court ruled that there was insufficient evidence to find that Stack was either insane or could not form the specific intent to commit the crimes

alleged. It convicted Stack of second degree murder and use of a deadly weapon to commit a felony, but it acquitted him of the abuse charge. Following a sentencing hearing, the district court sentenced Stack to consecutive terms of 80 years' to life imprisonment for second degree murder and 40 to 50 years' imprisonment for use of a deadly weapon to commit a felony. Stack now appeals.

## 2. Circumstantial Evidence at Trial

### (a) Crime Scene and Stack's Arrest

Stack and Bauermeister had been living together for more than 15 years but were not in a dating relationship at the time relevant to this case. By all accounts, Stack was an alcoholic.

Stack and Bauermeister shared a trailer home with Bauermeister's 90-year-old mother. Bauermeister's mother was wheelchair-bound, was unable to get out of bed on her own, and could not take care of her own basic needs.

Bauermeister's daughter testified that she and Bauermeister communicated daily, but Bauermeister did not respond to her daughter's attempts to reach her after they had a disagreement on November 8, 2017. On November 16, Bauermeister's daughter and brother discovered Bauermeister deceased on her living room floor. They found Bauermeister's mother in a bedroom, lying on her hospital bed in her own urine and feces. Bauermeister's mother was admitted to a hospital due to severe dehydration.

When law enforcement searched the residence, they observed that Bauermeister had severe head trauma, blood around her hair, yellow brain matter in her hair, and brown hair strands in her hand and on the carpet near her. The scene was processed for DNA and blood evidence. There was blood spatter in the living room area and additional possible blood evidence between the living room and Stack's bedroom. On the floor of Stack's bedroom, officers located a "Crosman 66 Powermaster BB rifle[/pellet gun]," .177 caliber, with a sight near the tip of the gun barrel. A gray or silver pellet was in the clip of the gun. A detective who investigated the scene

testified that he observed what appeared to be dried bloodstains and brain matter on areas of the gun.

The same day Bauermeister's body was discovered, law enforcement took Stack into custody. They located him parked in Bauermeister's truck, which he sometimes drove. The officer who transported Stack to the station testified that he could smell the strong odor of an alcoholic beverage coming from Stack. At the station, Stack's clothing was collected. In photographs taken shortly after his arrest, Stack appears to have brown hair.

### (b) Autopsy

Dr. Michelle Elieff, a general and forensic pathologist, conducted an autopsy of Bauermeister's body on November 17, 2017. Based on the decomposition of the body, Elieff estimated that Bauermeister had been deceased for days, perhaps up to a week. Elieff identified the cause of death as extensive blunt force head injuries and two penetrating wounds to the head. The extensive blunt force injuries included multiple skull fractures and multiple scalp lacerations. Regarding the penetrating wounds, Elieff explained they were "what we refer to as missile wounds; they are a type of gunshot wound that are resulting from small projectiles, pellet-type projectiles." Elieff recovered a missile projectile, consistent with a pellet, from behind Bauermeister's right eye.

Elieff opined that the right angle or rectangular component on the sight of the pellet gun found in Stack's bedroom could be consistent with Bauermeister's pattern injuries. She also opined that the circular tip of the barrel of the gun could have caused the injuries.

### (c) Electronic Evidence

Upon Stack's arrest, Bauermeister's cell phone was found in her truck and later processed. There were 41 missed calls between November 14 and 16, 2017. The last four outgoing calls occurred between November 10 and 13. Twenty-seven text messages were received between November 9 and 16,

but it could not be determined who had viewed the messages. The last outgoing text message occurred on November 8. The last message from Bauermeister's social media account was also sent on November 8.

During the search of the crime scene, officers seized a laptop computer from Stack's bedroom. A "Skype" account on the laptop bore the username "Al Stack." The laptop showed multiple internet searches on November 7, 2017, for the make and model of pellet gun found in Stack's bedroom, a "Crosman 66 Powermaster BB rifle[/pellet gun]," .177 caliber. On November 8, there were various searches for iterations of whether a .177 caliber pellet can penetrate a human skull. The next day, there were multiple searches inquiring about various methods of suicide, among them were searches for "[i]s it possible to kill yourself with a pellet gun" and "kill yourself with a pellet gun." Nearly 2 hours after the last of these searches, there were searches for "can a .177 cal. penetrate a human skull" and "can a .177 cal. 66 powermaster penetrate a human skull." On November 10, at 9:22 p.m., a search was made for "decomposition of a human body timeline." Searches for "what gets supplied for you in jail and prison" and "are socks and under[wear] provided in jail or prison" were made on the morning of November 12.

Based upon the history on the cell phone and the laptop, along with the crime scene, the detective who processed the electronic evidence opined that Bauermeister was killed on or about November 10, 2017.

### (d) DNA Evidence

Forensic DNA analyst Mellissa Helligso tested numerous items for the presence of blood and for DNA. She used buccal swabs from Stack and Bauermeister for DNA comparison.

Helligso observed what appeared to be bloodstains on the front and back of Stack's pants, but she only tested a swab from one 2-inch long stain. That swab tested positive for blood. It generated a DNA mixture from two individuals. Bauermeister was not excluded as a major contributor. The

probability of an unrelated individual matching the major DNA profile, given that Bauermeister expressed the profile, was 1 in 1.08 nonillion, which Helligso testified "is 30 zeros." Stack was not excluded as a partial profile contributor. The probability of an unrelated individual matching the partial profile, given that Stack expressed such a profile, was 1 in 1.66 billion.

Also positive for blood were swabs from Stack's left shoe, which had a few areas of visible blood; from various areas of the pellet gun; and from Bauermeister's fingernails and her cell phone. DNA testing showed that Bauermeister was not excluded as the source. The probability of an unrelated individual matching the DNA profile, given that Bauermeister expressed such a profile, was 1 in 1.08 nonillion.

Helligso tested a swab from various textured areas of the gun for "touch DNA" contributed by skin cells. The swab generated a DNA profile from a mixture of two individuals. Stack and Bauermeister were not excluded as contributors. As to Stack, the probability of an unrelated individual matching the DNA profile, given that Stack expressed such a profile, was 1 in 36.3 sextillion. Regarding Bauermeister, the probability of an unrelated individual matching the DNA profile, given that Bauermeister expressed such a profile, was 1 in 17.9 quintillion. Helligso testified that she cannot know when DNA was deposited on an item and that she has found touch DNA on an item up to 2 years after it has been handled by a person.

Helligso attempted to test a brown hair strand found in Bauermeister's hand, but she could not obtain a DNA profile from the root area. And she did not have the capability in her laboratory to test the remainder of the strand for a different form of DNA.

(e) Jailhouse Recordings

While incarcerated for the present offenses, Stack spoke to his brother. A recording of their conversation was received as evidence. In the conversation, Stack told his brother about

his relationship with Bauermeister and his limited memory of the days surrounding her death:

Stack's brother: So you just don't even remember what happened . . . ?

Stack: No, I remember a couple of days before, I mean, how irritated I was getting and drunk because that was the only thing that would calm me down . . . . [T]here's not much I can say, I mean, I can say how evil and mean [Bauermeister] was to me for a long period of time because that's what I remember from before, but I don't remember damn near probably five days. I just don't.

Stack's brother: Well, I would assume you were hammered.

Stack: Yeah I was drinking over a case of beer and I went back to booze too. I was drinking booze.

. . . .

Stack: . . . [T]he night they found me in the parking lot. They arrested me.

. . . .

Stack's brother: So what did you do for those days?

Stack: I don't remember. I just drunk, drank. I don't remember. I drank and drove around. I didn't eat anything. I was, I was upset. I don't know. I remember, I don't know what I really remember. It seems like I remember at one point I knew I was gonna be dead or something because I went back home and seen, seen the house and I had to just stay drunk.

. . . .

Stack's brother: . . . I mean, um, I get, I get that you blacked out, um, but you said you went, you actually, after you had done it there was a point in time when you went back there?

Stack: I'm a, I slightly remember it, yeah, because I knew I had to leave, get outta there and I don't remember how long it was that I was driving around in the truck before they found me . . . I didn't have no clue where

I was. All I know is I was drinking booze and beer constantly, not eating and that's all I can explain.

Minutes later in the conversation, Stack continued:

[T]o me, that's not me. I obviously fucking lost it or something. I don't know. I know I was drinking hard and I know I was fed up a long time before that. It got to that point. I know that, I remember that much. For me to believe everything or what actually happened, I just don't know, and I don't even really want to talk about it now.

. . . .

Stack's brother: . . . [I]f you're hammered and you do what apparently it looks like you did, I don't think it makes you any less guilty.

Stack: No, I don't think it does either. . . .

. . . I mean I did want to be alone. That's what I was thinking weeks, weeks before. I started to get real drunk again I was and I did want to be alone, I did want to be alone. I didn't want to listen to her mouth anymore. I remember thinking things like that but that's not, that hasn't got anything to do with it. I don't. But that's, I mean that's why I was in no hurry to call anybody anyway because I didn't want to sit here and try to explain shit to everybody that I don't even understand myself.

The district court also received a recording of a telephone conversation Stack had with his sister while in jail awaiting trial for the present offenses:

Stack: They pulled some shit off of my computer or somethin' I think is what they're sayin'. They don't, they don't know what I was doin' with it. I don't even know what they . . . . But I know what I looked up on the computer. I was looking up suicides and I was looking up what I could shoot with my BB gun and stuff like that. I know that's what I looked up because that was before I went on a drinking rampage[.]

. . . .

Stack's sister: But you remember searching stuff like that?

Stack: Mm. . . hm . . . that was before I went off the reservation.

Stack's sister: Yeah, okay, alright, mm, ok so you do remember that so I don't know do you think maybe you did a search on something else that you don't remember?

Stack: It's possible. I mean I don't know about that. I mean I remember what I did do as far as, you know as far as suicide I know I did do that because I remember that because . . . .

Stack's sister: Okay.

Stack: I was the one who wanted out. I wasn't going to do anything about her.

### 3. Testimony Relevant to Insanity Defense

#### (a) Testimony of Dr. Terry Davis

In support of his insanity defense, Stack presented the testimony of Dr. Terry Davis, a board-certified forensic and addiction psychiatrist. Davis interviewed Stack in March 2018 and performed a mental status examination. He also reviewed Stack's medical record from an emergency room visit on November 17, 2017; information from Bauermeister's family; police reports; and a transcript of a recorded conversation between Stack and his brother.

Davis diagnosed Stack with a mild neurocognitive disorder and a severe level of alcohol use disorder. Davis testified that in Stack's evaluation and the records he reviewed, Stack consistently said that he did not remember killing Bauermeister, but he had brief memories from being in "his" truck on November 16, 2017, and speaking to an officer.

Davis testified about other statements Stack made in the evaluation that were received for the limited purpose of diagnosis, not the truth of the matter asserted. Stack informed Davis that he drank "constantly" before he was arrested and that he drank beer daily. He also stated that he drank hard liquor but switched to beer primarily after he developed pancreatitis. He

said that he did not have much of a memory of 1 or 2 months prior to Bauermeister's death because of his alcohol use.

Davis testified that severe alcohol use disorder can impair one's cognitive functioning on a permanent basis. Davis explained that an individual who drinks a large amount of alcohol may experience a blackout, or a period of "anterograde amnesia," and may not form lasting memories of what occurred during the blackout period. He testified that immediate and short-term memory are impaired during an alcoholic blackout. According to Davis, the blood alcohol concentration range for a blackout varies from person to person, but the range is typically between ".20 and .30 on the milligram percent scale." Davis observed that Stack's medical record from several hours after his arrest showed that his blood alcohol content was .119. And Stack reported that he previously experienced blackouts. Davis testified that Stack is more at risk for a blackout because of his mild neurocognitive disorder, but that the disorder itself would not cause a blackout.

It was Davis' opinion that, assuming Stack killed Bauermeister and did not have a memory of killing her, Stack was unable to form the specific intent to kill because he experienced an alcoholic blackout resulting from a combination of his alcohol ingestion and his alcohol-induced mild neurocognitive disorder. Again assuming that Stack killed Bauermeister, Davis opined that he suffered at that time from a mental disease or defect, specifically an alcohol-induced mild neurocognitive disorder. Further, as a result of that disorder, in combination with his consumption of alcohol, Stack experienced an alcoholic blackout, which caused him to be unable to know and understand the nature and consequences of his actions.

Davis opined that Stack's substance-induced mild neurocognitive disorder alone did not mean that Stack could not form the intent to kill Bauermeister, nor did it alone cause him not to know the nature and consequences of his actions. He explained that Stack's voluntary ingestion of alcohol was necessary to cause the blackout that, in combination with the

mild neurocognitive disorder, was the basis of Davis' opinions on intent and insanity.

### (b) Testimony of Klaus Hartmann and Mindy Abel

Dr. Klaus Hartmann, a board-certified forensic psychiatrist, evaluated Stack in December 2018 and reviewed the same or similar information as Davis, along with Davis' report. Dr. Mindy Abel, a clinical psychologist, was present for Hartmann's interview with Stack and conducted diagnostic testing. Hartmann testified that he disagreed with the method Davis used to diagnose Stack with mild neurocognitive disorder. Using a different method, Hartmann and Abel concluded that Stack did not have a neurocognitive disorder because he was able to remember the events leading up to and after Bauermeister's death. Hartmann testified that even people with mild neurocognitive disorders should know the consequences of their actions and appreciate what they are doing. Hartmann and Abel recognized that Stack had a history of blackouts. But Hartmann testified that someone who suffers from an alcoholic blackout knows and understands the consequences of their actions. Hartmann opined that Stack was not insane when Bauermeister was killed.

### 4. Sentencing

After rejecting Stack's insanity defense and finding him guilty of second degree murder and use of a deadly weapon to commit a felony, the district court ordered a presentence investigation report. It then conducted a sentencing hearing at which victim impact statements were received and the parties presented arguments. Considering the customary factors, the presentence investigation report, the victim impact statements, and the parties' arguments, the district court sentenced Stack within statutory limits. It imposed consecutive terms of 80 years' to life imprisonment for second degree murder and 40 to 50 years' imprisonment for use of a deadly weapon to commit a felony.

## II. ASSIGNMENTS OF ERROR

Stack assigns that the district court erred in (1) declining to direct a verdict and finding the evidence sufficient to support the verdicts; (2) determining that the evidence supported a finding of second degree murder rather than manslaughter; (3) overruling his insanity defense; and (4) imposing excessive sentences.

## III. STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

[2] The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

[3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

## IV. ANALYSIS

### 1. Sufficiency of Evidence

We begin with Stack's challenge to the sufficiency of the evidence. He argues that he was entitled to a directed verdict; that the circumstantial evidence in this case warrants a different standard of review; that the evidence does not support a conviction for second degree murder; and that if the district

court convicted him of any homicide offense, it should have been sudden quarrel manslaughter. As we will explain, these claims lack merit.

### (a) Directed Verdict

[4] Stack asserts that the district court erred by declining to grant a directed verdict in response to the motion to dismiss he made at the close of the State's case. But Stack waived this argument. The record shows that after Stack's motion was denied, he put on evidence in his defense. A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Vann*, 306 Neb. 91, 944 N.W.2d 503 (2020). We therefore consider only Stack's assertion that the evidence as a whole was insufficient to support his convictions.

### (b) Standard of Review

Because the standard of review defines our view of the evidence, we consider it before turning to the facts of this case. In arguing that the evidence was insufficient, Stack asks us to return to a standard of review that we have long since abandoned.

It is well established that in reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

Stack acknowledges the controlling standard of review, but he adds that "there are situations that just require this Court to take a different view of circumstantial evidence cases." Brief for appellant at 21. Stack suggests that we apply the "accused's rule," which provides that when two equal presumptions from circumstantial evidence—one in favor of innocence and the other in favor of guilt—are presented, a presumption in favor of innocence is to be preferred and applied. See *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995). For support, he cites some federal circuit courts that have applied a similar rule. See, e.g., *U.S. v. Glenn*, 312 F.3d 58 (2d Cir. 2002) (if evidence viewed in light most favorable to verdict gives equal or nearly equal circumstantial support to theory of guilt and theory of innocence of crime charged, appellate court must reverse conviction); *U.S. v. Flores-Rivera*, 56 F.3d 319 (1st Cir. 1995) (same). But see, e.g., *U.S. v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (abandoning rule).

Based on the evidence here, we have doubts that an application of the accused's rule would lead to a finding of insufficient evidence. But we need not resolve that issue, because we decline Stack's invitation to resurrect a rule that we have repeatedly rejected.

Prior to 1981, this court applied the accused's rule when reviewing circumstantial evidence. See *State v. Pierce, supra*. But observing various reasons why circumstantial evidence should be treated the same as direct evidence, we abandoned the accused's rule in *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981). In *Buchanan*, we held that one accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt, and we disclaimed any requirement that the State disprove every hypothesis but that of guilt. Over the years, we have briefly veered from this approach, only to steer definitively back to it and place circumstantial

evidence on equal footing with direct evidence. See, *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995), *overruled, State v. Pierce, supra*; *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992), *abrogated, State v. Pierce, supra*; *State v. Trimble*, 220 Neb. 639, 371 N.W.2d 302 (1985), *overruled, State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991), *disapproved on other grounds, Victor v. Nebraska*, 511 U.S. 1, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994). Most recently, in *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016), this court thoroughly recounted the demise of the accused's rule in Nebraska and again rejected the suggestion that it should be applied. And in light of our jurisprudence on the matter, we see no reason to apply the accused's rule here.

### (c) Circumstantial Evidence Supports Stack's Convictions

With our well-established standard of review in mind, we now determine whether there was sufficient evidence to support Stack's convictions for second degree murder and use of a deadly weapon to commit a felony. Stack challenges the sufficiency of the evidence on two bases. First, he argues that the evidence did not prove that he was the person who killed Bauermeister or that his pellet gun, which he does not dispute is a deadly weapon other than a firearm, was used to kill her. Second, he argues in the alternative that the district court should have convicted him of voluntary sudden quarrel manslaughter, rather than second degree murder. But both of these arguments fail.

[5] To prove second degree murder, a felony offense, the State was required to show beyond a reasonable doubt that Stack caused Bauermeister's death "intentionally, but without premeditation." See Neb. Rev. Stat. § 28-304 (Reissue 2016). Voluntary manslaughter, also a felony, is a lesser degree offense, not a lesser-included offense, of second degree murder. See *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). That is, it is possible to commit second degree murder without committing voluntary manslaughter. See *id.* Both second

degree murder and voluntary manslaughter involve intentional killing; they are differentiated only by the presence or absence of the sudden quarrel provocation. *State v. Smith, supra* (where there is evidence that killing occurred intentionally without premeditation and that defendant acted under provocation of sudden quarrel, fact finder has option of conviction of second degree murder or voluntary manslaughter depending on resolution regarding sudden quarrel provocation.) See, also, Neb. Rev. Stat. § 28-305(1) (Reissue 2016).

In disputing the theory that he committed second degree murder by killing Bauermeister with his pellet gun, Stack takes a selective view of the evidence, focuses on other possible explanations for Bauermeister's death, and characterizes the investigation as incomplete. In essence, Stack contends that the State failed to disprove every hypothesis, other than Stack's guilt, that could be drawn from the circumstantial evidence. And according to Stack, even if the evidence did show that he killed Bauermeister with his pellet gun intentionally and without premeditation, evidence of multiple blows demonstrated that a sudden quarrel occurred and that voluntary manslaughter was the proper conviction. To support this position, Stack further cites a lack of evidence about recent fighting or animosity between Stack and Bauermeister and a lack of evidence conclusively showing when the internet searches occurred in relation to Bauermeister's death. That is, Stack suggests that the circumstantial evidence supports the presumption that a sudden quarrel occurred to the same extent that it supports the opposite conclusion and that we should resolve the matter in favor of the less onerous offense. However, as explained above, whether arguing that he did not kill Bauermeister or that he did so upon a sudden quarrel, Stack depends on an improper standard of review. Viewing the evidence in the light most favorable to the prosecution, as our standard of review requires, a rational trier of fact could have found beyond a reasonable doubt that Stack used his pellet gun, a deadly weapon other than a firearm, to kill

Bauermeister intentionally, but without premeditation and not upon a sudden quarrel.

The State presented circumstantial evidence that Stack, without premeditation, intentionally killed Bauermeister with his pellet gun. The record shows that over time, Stack had become irritated with Bauermeister and wanted to be alone. Bauermeister was found on November 16, 2017, in the residence she and Stack shared, dead due to blunt force head trauma from multiple blows and multiple missile injuries, both consistent with a pellet gun Stack owned. Testing showed an extremely high probability that blood found on the pellet gun was Bauermeister's and that touch DNA on the weapon belonged to Stack. In Bauermeister's hand and on the floor nearby were strands of brown hair, like Stack's. Stack was apprehended with Bauermeister's cell phone, which had blood on it that was most likely Bauermeister's. Testing of two spots among multiple bloodstains revealed an extremely high probability that Bauermeister's blood was on the pants and one of the shoes Stack was wearing when he was arrested. Stack's computer reflected that from November 7 through 9, the days before Bauermeister's estimated date of death, there were internet searches regarding whether a pellet gun could kill someone, among searches for suicide methods. In postarrest statements to his sister, Stack admitted to conducting internet searches related to suicide and what he could shoot with his pellet gun. On November 10, there was a search for "decomposition of a human body timeline," followed by searches inquiring what items are provided in prison. In a conversation after his arrest, Stack did not contradict his brother's suggestion that Stack had killed Bauermeister and confirmed that he was at the crime scene after her death.

[6-8] Furthermore, upon our review of the record, we see no evidence of a sudden quarrel. A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). It is not the provocation alone that reduces the grade of the crime, but, rather, the

sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent. *Id.* Although there was evidence that Stack was irritated with Bauermeister, in the absence of some provocation, a defendant's anger with the victim is not sufficient to establish the requisite heat of passion. *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011). And the fact that Stack may have been intoxicated is not a proper consideration in determining whether the killing arose from a sudden quarrel. See *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). Further, contrary to Stack's suggestion, a sudden quarrel does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. *Id.*

In sum, under the proper standard of review, we conclude the evidence was sufficient to support Stack's convictions.

## 2. Insanity Defense

Any person prosecuted for an offense may plead that he or she is not responsible by reason of insanity at the time of the offense. Neb. Rev. Stat. § 29-2203(1) (Reissue 2016). A successful insanity defense would be dispositive in Stack's favor, regardless of the evidence that he killed Bauermeister with a deadly weapon. See *State v. Bigelow*, 303 Neb. 729, 931 N.W.2d 842 (2019) (successful insanity defense operates as complete defense). Therefore, even though the evidence was sufficient to prove the elements of second degree murder and use of a deadly weapon other than a firearm to commit a felony, we must address Stack's claim that the district court erred by finding that he had failed to prove he was legally insane at the time he committed those offenses.

[9] Generally, under Nebraska's common-law definition, the insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and

consequences of his or her actions or that he or she did not know the difference between right and wrong. *Id.* The defendant carries the burden to prove the defense by a preponderance of the evidence. See § 29-2203(1). The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

To support his insanity defense, Stack relies on the testimony of Davis, who opined that Stack had a mild neurocognitive disorder and that as a result of such mental disease or defect in combination with his alcohol consumption, Stack experienced an alcoholic blackout, which caused him to be unable to know and understand the nature and consequences of his actions. However, as the State points out, under § 29-2203(4), "insanity does not include any temporary condition that was proximately caused by the voluntary ingestion . . . of intoxicating liquor." Pursuant to this statute, the State argues, Stack was not legally insane under Davis' opinion because it was based on Stack's experiencing a blackout, a temporary condition caused by voluntary alcohol consumption. Stack contends that because voluntary intoxication was not the sole basis for Davis' opinion that he was insane, Stack is not precluded from the benefit of the insanity defense. Although we have discussed the relationship between intoxication and insanity, we have not, since the adoption of § 29-2203(4), considered whether voluntary intoxication in combination with a mental disease or defect can be the basis for a successful insanity defense. See, *State v. Bigelow, supra*; *State v. Hotz*, 281 Neb. 260, 795 N.W.2d 645 (2011). And based on the record in this case, we need not do so today.

Here, even if the State's argument concerning voluntary intoxication is set to the side, there was sufficient evidence that Stack did not fulfill a crucial element of legal insanity: a mental disease or defect. As mentioned, Stack's expert, Davis, opined that Stack had a mental disease or defect in the form of a mild neurocognitive disorder. However, the State's experts, Hartmann and Abel, disagreed. Their diagnostic

testing showed that Stack did not suffer from a mild neuro-cognitive disorder. Thus, Davis' opinion on the issue of legal insanity was in direct conflict with the evidence presented by the State, and it was the province of the district court to resolve that conflict. See *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact). Given the opinions of Hartmann and Abel, the record contained sufficient evidence for the district court to conclude that Stack was not legally insane at the time of Bauermeister's murder. Stack's assertion to the contrary lacks merit.

## 3. Excessive Sentences

Lastly, Stack contends that his sentences were excessive. He does not and cannot dispute that he was sentenced within statutory limits. Instead, Stack argues that the sentences do not fit the crime or him as an offender. He points out that given his age, he will effectively have no opportunity for parole for crimes that he characterizes as not especially depraved and heinous. He also cites his limited criminal record and his poor health as mitigating factors. We are not persuaded.

[10-12] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor

and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

According to the record, the district court considered the familiar factors above, along with other information in the presentence investigation report and evidence received at the sentencing hearing. Thus, it took into account the factors Stack says justified a lesser penalty along with other factors. Those other factors included the particularly violent nature of Bauermeister's murder and the circumstances surrounding it. Based on the record in this case and the relevant considerations, we conclude that the district court did not abuse its discretion in sentencing Stack.

## V. CONCLUSION

Finding no merit to the errors assigned and argued by Stack, we affirm.

AFFIRMED.