Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/19/2022 09:06 AM CDT

State of Nebraska, appellee, v.
Jesse O. Knight, appellant.
___ N.W.2d ___

Filed July 12, 2022.    No. A-21-158.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Words and Phrases.** Recklessness is the disregard for or indifference to the safety of another or for the consequences of one's act.

3. **Criminal Law: Motor Vehicles.** Reckless driving lies somewhere between careless driving and willful reckless driving.

4. ____: ____. Incidents of willful reckless driving commonly involve some combination of a high level of speeding that is particularly dangerous based on the circumstances, such as speeding on a heavily populated roadway; fleeing arrest; hitting other vehicles or property (or the threat of this occurring); road rage; driving through stop signs and red lights; or other forms of particularly erratic driving. On the other hand, reckless driving cases often involve less extreme actions, such as moderate speeding, erratic lane changes, and other forms of irresponsible driving.

Appeal from the District Court for Sarpy County: Michael A. Smith, Judge. Affirmed.

Joshua W. Weir, of Black & Weir Law Offices, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Jesse O. Knight appeals from his convictions of motor vehicle homicide by reckless driving and reckless driving. The sole issue on appeal is whether the evidence was sufficient for the jury to find that Knight was guilty of driving recklessly, as opposed to the lesser-included offense of driving carelessly. For the following reasons, we affirm.

## BACKGROUND

On November 16, 2020, the State filed an amended information charging Knight with two counts of motor vehicle homicide by reckless driving, in violation of Neb. Rev. Stat. § 28-306(3)(a) (Reissue 2016), and one count of reckless driving, in violation of Neb. Rev. Stat. § 60-6,213 (Reissue 2021). The amended information further charged Knight with one count of operating a commercial motor vehicle with a canceled commercial motor vehicle license, in violation of Neb. Rev. Stat. § 60-4,141(1) (Reissue 2021); however, Knight pleaded guilty to that charge and does not challenge that conviction on appeal.

A jury trial on the State's amended information was held over the course of 3 days from November 18 to 20, 2020. The parties entered into a stipulated set of facts establishing that on August 7, 2019, Knight was operating a loaded Kenworth dump truck traveling eastbound on Highway 370 in Sarpy County, Nebraska, when he collided with vehicles stopped at the red traffic light located at the intersection of Highway 370 and 192d Street. Two children were killed in the collision, and Knight's "unlawful operation of a motor vehicle was the proximate cause of [death]." Furthermore, Knight caused the deaths of the two children "unintentionally while engaged in the

operation of a motor vehicle in violation of the law of the State of Nebraska." Further stipulations will be discussed below, but suffice it to say that Knight stipulated he was guilty of motor vehicle homicide in violation of § 28-306(1). The only question submitted to the jury was whether Knight had been driving recklessly and was thus guilty of the aggravated offense of motor vehicle homicide by reckless driving described under § 28-306(3)(a).

In addition to the above, the parties further stipulated to the following facts: The traffic lights at the intersection of Highway 370 and 192d Street were fully operational and turned red as Knight approached the intersection. There were yellow warning signals placed on both sides of eastbound Highway 370 approximately 648 feet before the intersection. The yellow warning signals contained a sign advising drivers to "'prepare to stop when [yellow lights attached are] flashing,'" and the attached yellow lights were flashing when Knight passed the warning signals. There were two vehicles ahead of Knight's dump truck in the right lane of eastbound Highway 370. Both vehicles came to a stop at the intersection of Highway 370 and 192d Street and remained stopped as Knight approached the intersection. The first vehicle to stop at the intersection was a Honda Accord with one occupant, and the second vehicle was a Toyota Sienna with five occupants. The posted speed limit was 55 miles per hour, and Knight's vehicle initially collided with the Toyota Sienna while traveling at "a minimum [speed] of 47 miles per hour," ultimately killing two of the five occupants. Knight received a phone call at 9:32:13 a.m. which lasted 13 minutes 23 seconds, indicating that the call was ended at 9:45:36 a.m. The first 911 emergency dispatch service call following the collision was received by dispatch at 9:47:21 a.m., and the eyewitness who placed the call estimated that he made the call between 30 seconds and 1 minute after the collision. This estimate places the collision between 9:46:21 a.m. and 9:46:51 a.m., approximately 1 minute after Knight ended the 13-minute phone call. Finally, there were no

signs that Knight was under the influence of any intoxicants at the time of the collision.

At trial, the State adduced additional evidence relevant to whether Knight operated his vehicle in a reckless manner. Photographs of the scene depict the pertinent section of Highway 370 as a flat and straight stretch of road. Moreover, photographs taken shortly after the collision depict clear and sunny weather conditions on the day in question. Multiple eyewitnesses testified that Knight's dump truck showed no signs of slowing down or taking evasive action as it approached the two vehicles stopped at the intersection, causing the witnesses to fear a collision was imminent.

A Sarpy County sheriff's deputy conducted a search of Knight at the scene and testified that Knight did not possess any device for hands-free cell phone use. Another Sarpy County sheriff's deputy spoke with Knight at the scene and testified that Knight told him that he "saw the red light and saw the vehicles stopped, and he hit the brakes but nothing happened." That deputy later clarified that Knight said not that he saw the light turn red, but that he "saw the red light."

A Sarpy County sheriff's investigator testified that he analyzed data from Knight's cell phone using "Cellbrite" software, which was the basis for the stipulated facts related to the 13-minute phone call. The investigator testified that the software collects data such as call logs, internet history, and text messages, but that the data collected from Knight's cell phone would not show whether he was otherwise distracted by his phone. On cross-examination, the investigator confirmed that the software report also would not indicate whether Knight was using the speaker function on the cell phone.

Shawn Reeh worked as a part-time mechanic for the company that owned the Kenworth dump truck Knight was driving, and he testified that he was responsible for inspecting and maintaining the truck. Reeh testified that he conducted yearly inspections on the truck, the most recent of which occurred in March 2019. The State submitted Reeh's annual

inspection reports for the years 2016 to 2019, and Reeh testi-
fied at length regarding the manner in which he inspected and
maintained the brake system on the truck. In addition to the
yearly inspections, Reeh testified he also conducted periodic
inspections on the truck roughly once every 2 weeks. While
Reeh could not recall the precise day on which he conducted
the most recent inspection on the truck, he testified that it
would have been within 2 to 3 weeks of the accident.

Reeh testified that the truck was equipped with an airbrake
system which uses compressed air to disengage the emergency
or parking brakes and engage the "service brakes," the latter of
which operate when the driver presses the brake pedal. Reeh
testified that the brake system is built with redundancies such
that if there were a catastrophic loss of air pressure in the sys-
tem, then the emergency brake would automatically engage to
stop the truck. Reeh also noted that the system's air compressor
is capable of coping with minor air leaks in the system and that
"it would have to be a large leak" for a driver to notice a loss
of function in the service brakes.

Trooper Cody McGee of the Nebraska State Patrol con-
ducted a postcrash inspection on the truck, and the State
submitted numerous photographs taken by McGee during his
inspection. One such photograph showed a log of Knight's
trips on the morning in question, which log indicated that
Knight was on his second or third trip of the day. McGee also
discussed how the towing company had to "cage" the brakes
to tow the truck from the scene, indicating that the emergency
brakes were operational and engaged after the crash. McGee
noted a number of "violations," which he referred to as either
"pre-crash" or "post-crash." For example, McGee testified
that he discovered a "small leak" in an airhose that he marked
as a "pre-crash violation"; however, he added that he "could
not definitively say" whether it was precash or postcrash. In
any case, McGee testified that in his experience, small leaks
such as that do not cause catastrophic brake failure. McGee
opined that even if this minor leak was a precrash violation,

it would not have had any impact on the functionality of the service brakes. In contrast, McGee testified that he also discovered a "broken air line," which he identified as a postcrash violation that would have caused catastrophic air loss from the braking system, as it was a "much bigger hose, and a lot more air comes out of that." McGee identified a number of additional postcrash violations in the "air tanks" and "air line[s]," further suggesting that the crash precipitated a catastrophic air loss causing the emergency brakes to engage. The day after the collision, McGee reconstructed the braking system and was able to determine that the service brakes "were working fine before the crash."

Sgt. John Mobley of the Nebraska State Patrol testified that he was trained as a traffic crash reconstructionist. While Mobley did not conduct the crash reconstruction in this case, he testified briefly regarding the reported minimum speed of 47 miles per hour as stipulated by the parties. Mobley confirmed that a report of a minimum speed is just that, it "is purely a minimum" speed required to generate the evidence left at the scene. Mobley explained, "What you're doing is trying to account for all of the energy that was expended through braking . . . roadway friction . . . and then you also have energy that's expended in the crush of . . . the two vehicles . . . ." Mobley added that in his training and experience, if 47 miles per hour was the reported minimum speed, then "typically, [the vehicle was] going faster than that."

Sgt. Kyle Percifield of the Sarpy County sheriff's office was also trained as a crash reconstructionist, and he testified that he completed a crash reconstruction in this case. Percifield testified that based on witness accounts, the evidence at the scene, and his prior experience investigating similar cases, he "was able to draw the conclusion that . . . Knight did not react or brake prior to the collision." On cross-examination, Percifield acknowledged that the center of mass of the damage to the Toyota Sienna was located slightly to the right or passenger side of that vehicle, suggesting that Knight may have turned

the truck slightly to the right prior to impact. Yet, Percifield reiterated his assessment that there was no evidence to indicate Knight took evasive action prior to impact.

While Percifield ultimately concluded that Knight wholly failed to brake prior to the collision, he specifically testified that his investigation revealed no signs of "heavy braking" prior to the collision. When asked about his use of the term "heavy braking," Percifield confirmed that he could not rule out normal braking which would not have left tire marks on the roadway. However, Percifield explained that he was nevertheless able to conclude that no braking had occurred, because it would not have made sense for Knight to apply normal braking under the circumstances of this case. That is, giving Knight the benefit of the doubt that he did not intend to collide with the stopped vehicles, Percifield concluded that upon seeing the red light and stopped vehicles, Knight would have applied heavy braking as opposed to normal braking. However, because there was no evidence of heavy braking prior to the collision, Percifield concluded that Knight failed to brake at all, indicating either that Knight did not see the red light and stopped cars or that he noticed them at a point too late to stop or steer the truck to avoid a collision.

Percifield testified that data collected from the Toyota Sienna's airbag control module demonstrated that the truck was traveling "at least" 47 miles per hour at the point of impact. Percifield explained that the airbag control module in the Toyota Sienna recorded only the "longitudinal change in velocity," such that the data merely indicated the minimum speed of impact required to account for the force exerted on the longitudinal axis of the vehicle running from front to back. Percifield further testified that because the impact was not "completely square," there must have been some degree of "lateral forces" acting on the Toyota Sienna. These lateral forces, if known, would increase the impact speed required to account for all of the energy exerted on the vehicle. However, because the Toyota Sienna did not record the lateral change in

velocity, Percifield was able to determine the minimum speed required to account for only the longitudinal forces, which was 47 miles per hour. Based on this and additional data collected from the scene, Percifield calculated that Knight would have needed between 229 and 242 feet of road to safely stop the truck. Percifield noted that there was approximately twice that distance (648 feet) between the flashing yellow warning signals and the intersection where the collision occurred.

After trial, the jury found that Knight was driving recklessly and thus found him guilty of two counts of motor vehicle homicide by reckless driving and one count of reckless driving. Knight appeals.

## ASSIGNMENTS OF ERROR

Knight assigns that (1) the evidence adduced at trial was insufficient to support convictions for motor vehicle homicide by reckless driving and (2) the evidence at trial was insufficient to support a conviction for reckless driving.

## STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## ANALYSIS

Section 28-306(1) provides in pertinent part that "[a] person who causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska . . . commits motor vehicle

homicide." Section 28-306(2) provides that "[e]xcept as provided in subsection (3) of this section, motor vehicle homicide is a Class I misdemeanor." Section 28-306(3)(a) provides that "[i]f the proximate cause of the death of another is the operation of a motor vehicle in violation of section 60-6,213 or 60-6,214, motor vehicle homicide is a Class IIIA felony." Section 60-6,213 defines the offense of reckless driving, and Neb. Rev. Stat. § 60-6,214 (Reissue 2021) defines the offense of willful reckless driving.

As discussed above, the parties stipulated that Knight committed motor vehicle homicide as defined in § 28-306(1). The only dispute at trial was whether Knight also committed the offense of reckless driving, thereby triggering the aggravated offense of motor vehicle homicide by reckless driving defined in § 28-306(3)(a). After trial, the jury answered that question in the affirmative and thus found Knight guilty of motor vehicle homicide by reckless driving and reckless driving. On appeal, Knight argues the evidence was not sufficient to find that he was driving recklessly, such that the jury should have merely found him guilty of motor vehicle homicide and careless driving. Thus, the only question before this court is whether, viewing the evidence in the light most favorable to the prosecution, any rational jury could have found that Knight was driving recklessly beyond a reasonable doubt.

[2-4] Under § 60-6,213, "[a]ny person who drives any motor vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property shall be guilty of reckless driving." Recklessness is the disregard for or indifference to the safety of another or for the consequences of one's act. *State v. Green*, 238 Neb. 475, 471 N.W.2d 402 (1991). Reckless driving lies somewhere between careless driving and willful reckless driving. *Id.* Careless driving occurs when a person drives "without due caution so as to endanger a person or property." Neb. Rev. Stat. § 60-6,212 (Reissue 2021). Willful reckless driving occurs when a person drives "in such a manner as to indicate a willful disregard

for the safety of persons or property." § 60-6,214. This court
has previously observed:

> [I]ncidents of willful reckless driving commonly involve
> some combination of a high level of speeding that is par-
> ticularly dangerous based on the circumstances, such as
> speeding on a heavily populated roadway; fleeing arrest;
> hitting other vehicles or property (or the threat of this
> occurring); road rage; driving through stop signs and red
> lights; or other forms of particularly erratic driving. . . .
>
> On the other hand, reckless driving cases often involve
> less extreme actions, such as moderate speeding, erratic
> lane changes, and other forms of irresponsible driving.

*State v. Scherbarth*, 24 Neb. App. 897, 906-07, 900 N.W.2d
213, 221 (2017). While the present case does not involve evi-
dence of speeding, erratic lane changes, or aggressive driving,
we nevertheless conclude that there is evidence of irresponsible
driving which, when viewed in the light most favorable to
the prosecution, is sufficient to support a finding that Knight
exhibited an indifferent or wanton disregard for the safety of
persons or property.

On appeal, Knight asserts he was not driving recklessly
insofar as "[h]is driving was normal and unremarkable but for
the moment of inattention or driver error immediately preced-
ing the accident." Brief for appellant at 13. It is true that the
collision in this case could have precipitated from inatten-
tion or driver error, as opposed to aggressive or erratic driv-
ing per se. However, the evidence belies any suggestion that
such inattention or driver error was confined to the moment
immediately preceding the collision. Rather, Knight failed to
attend to the flashing yellow warning signals placed 648 feet
before the intersection. Knight then failed to attend to the traf-
fic light which turned red as he approached the intersection.
Finally, Knight failed to attend to the vehicles in front of him,
which had slowed and ultimately stopped at the red light prior
to the collision. Moreover, Knight participated in a 13-minute
phone call which was estimated to have ended approximately

1 minute before the collision, and it is possible that the phone call itself, or continued attention to the phone after the call ended, contributed to Knight's inattention.

The evidence demonstrates that Knight would have needed between 229 and 242 feet of road to safely stop the truck. If he had noticed the flashing warning signals, then he would have had well over twice that distance to stop the truck. Even having failed to observe the flashing warning signals, Knight had ample opportunity to heed the red light and vehicles stopped in front of him. Furthermore, even if Knight failed to observe the red light and stopped vehicles in time to stop the truck, any meaningful notice thereof would have provided an opportunity to hit the brakes and steer the truck away from the stopped vehicles. Yet, Knight apparently failed to take any action to avoid the collision, save possibly turning the truck ever so slightly to the right.

Altogether, it is clear that whatever the cause of Knight's inattention, such lasted much longer than a moment. Rather, Knight was so distracted that he neglected to heed numerous warning signs and drove a loaded dump truck straight through a red traffic light at full speed. Sustained inattention of this sort, when viewed in the light most favorable to the prosecution, is evidence sufficient to allow a rational jury to conclude that Knight was engaged in reckless driving at the time of the accident. See *Commonwealth v. Cady*, 300 Va. 325, 863 S.E.2d 858 (2021). Accordingly, we affirm Knight's convictions for motor vehicle homicide by reckless driving and reckless driving.

## CONCLUSION

For the foregoing reasons, we affirm Knight's convictions for motor vehicle homicide by reckless driving and reckless driving.

Affirmed.