IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FULTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEREMY M. FULTON, APPELLANT.

Filed September 24, 2024.    No. A-23-715.

Appeal from the District Court for Scotts Bluff County: ANDREA D. MILLER, Judge. Affirmed.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Scotts Bluff County District Court, Jeremy M. Fulton (Fulton) was convicted of first degree sexual assault of a child, incest, third degree sexual assault (two counts), child abuse, and contributing to the delinquency of a child. The victims were his teenage stepdaughters. The district court sentenced him to an aggregate of 48½ to 66 years' imprisonment, which includes a mandatory minimum of 15 years' imprisonment. Fulton appeals, claiming that two of his witnesses should have been allowed to appear virtually, there was insufficient evidence to convict him, his sentence was "mathematically impossible" and excessive, and prosecutorial misconduct deprived him of a fair trial. He also asserts numerous claims of ineffective assistance of trial counsel. We affirm Fulton's convictions and sentences.

- 1 -

## II. BACKGROUND

### 1. CHARGES AND PRETRIAL MOTIONS

The criminal charges in this case stem from Fulton's inappropriate conduct with his stepdaughters, particularly H.C., born in October 2005, and S.C., born in April 2007. Fulton's youngest stepdaughter, M.C., was a named victim in the initial information filed against Fulton, but the charge related to her was dismissed prior to trial. Becky Fulton (Becky) is Fulton's wife, and the mother of H.C., S.C., and M.C.

On December 1, 2022, the State filed an information charging Fulton with seven counts: count I, "1st Degree Sexual Assault on Child More Than 12 Years of Age but Less Than 16," pursuant to Neb. Rev. Stat. § 28-319.01(2) (Reissue 2016), a Class IB felony; count II, "Incest Under 18 Years of Age," pursuant to Neb. Rev. Stat. § 28-703 (Reissue 2016), a Class IIA felony; counts III and IV, "Third Degree Sexual Assault, Non-Injury," pursuant to Neb. Rev. Stat. § 28-320(1)(a) and (3) (Reissue 2016), Class I misdemeanors; count V, "Sexual Assault of a Child, 3rd Degree," pursuant to Neb. Rev. Stat. § 28-320.01 (Reissue 2016), a Class IIIA felony; count VI, "Child Abuse, Knowingly and Intentionally," pursuant to Neb. Rev. Stat. § 28-707 (Cum. Supp. 2022), a Class IIIA felony; and count VII, "Contributing to Delinquency [of a Child]," pursuant to Neb. Rev. Stat. § 28-709 (Reissue 2016), a Class I misdemeanor. H.C. was the named victim in count III, M.C. was the named victim in count V, and S.C. was the named victim in the remaining counts.

On March 27, 2023, the State filed a "Motion to Endorse Witness," namely "LaTisha Connelly, who is a material and necessary witness." No ruling on that motion appears in our record. On June 20, the State filed its "Pre-Trial Compliance" wherein Connelly was disclosed as one of the witnesses. In a "Jury Trial Setting Order" entered on June 26, the district court set the case for jury selection on July 12, with trial beginning immediately following selection. The court stated, "Unless otherwise ordered by the Court, the case will proceed to trial based on the pretrial materials which have been supplied to the trial judge." The court also stated, "There are no pending motions."

Also on June 26, 2023, Fulton filed two "Motion[s] for Witness to Appear by Webex." He requested that the district court allow witnesses Jim Fulton and Laura Fulton to appear by Webex for the jury trial because Jim and Laura "live[] in Alabama and [are] unable to travel for the jury trial." Following a hearing, the court denied Fulton's motions to have witnesses appear via video because the State did not consent.

In an amended information filed on July 5, 2023, the State dismissed count V ("Sexual Assault of a Child, 3rd Degree"; M.C. was the alleged victim). The State maintained the other charges but changed the date of the alleged offenses in all but count VII.

### 2. TRIAL

A jury trial was held on July 12 and 13, 2023. Evidence was presented through witness testimony and exhibits. Fulton did not testify in his own behalf. A summary of the evidence follows.

(a) S.C.'s Testimony

S.C., 16 years old at the time of trial, testified that Fulton is her stepfather, and she has known him since she was 5 years old. S.C. and her sisters were previously removed from their mother's home around 2015 when they were living in a farmhouse "somewhere" in Nebraska; "[t]hey just came and took us for abuse." S.C. and her sisters then went to live with their father in Rapid City, South Dakota. In the summer of 2018, the girls went to stay with their mother and Fulton, but "[a]bout two weeks" into the visit, the girls were removed from their mother's home and put in foster care after H.C. "hurt herself." After about a month of being in foster care, the girls went back to Rapid City to live with their father.

The girls next saw their mother in the summer of 2021. S.C. said, "My dad and my mom made a deal because my mom decided that she wasn't going to be with [Fulton] anymore and she wanted to see us." In "June maybe," the girls went to live with their mother and grandmother in a trailer house in Gering, Nebraska. In October, the girls' grandmother moved out of the home and Fulton moved into the home. S.C. stated that "everything was good at first and then it just started getting sexual and very uncomfortable." Fulton "started touching us and groping on us." S.C. explained that Fulton "usually wore like really thin basketball shorts and a t-shirt," and

> [w]hen [Fulton] hugged us he would pull us in and kind of like rub everything against us. And he would pull us in tight and slap our butts when he walked by. And he would comment on our clothing and just . . . he was very sexual about it.

(Ellipsis in original.) She explained that Fulton rubbing against them meant "[h]e was rubbing his penis against our legs." This happened "[a]nytime he gave us a hug goodbye or just good night," and "[i]t would happen every single day."

On April 3, 2022, S.C.'s mother and sisters were not home because they were "watching the dogs" for an uncle. S.C. and Fulton decided to get alcohol, which S.C. thought "might have been cool." There was "wine, a Malibu bottle, a peach kind of alcohol, and some other type of alcohol." S.C. said, "[Fulton] poured me a glass and he poured himself a glass, and we just drank in the living room." Fulton also showed S.C. "a step-daughter and step-dad porn video" on his phone. S.C. "got too drunk" and "passed out." Later, she woke up on the couch, was naked, had "vomit" on and underneath her face, and her vagina and anus were "really sore." She asked Fulton what happened, and he told her that they had sex on the couch and that he put his finger "up [her] butt" when they had sex. He also told her that they had oral sex and he "pushed [her] head too far down . . . and [she] threw up on him and passed out on the couch." S.C. did not go to school on April 4th but did go to school on April 5th. She did not tell anyone what happened "for a while" because she "was scared."

On April 5 and 6, 2022, S.C. received text messages from Fulton. The text messages, found in exhibit 23, were received into evidence without objection and showed the following exchange that we set forth verbatim, including grammatical, typographical, and spelling errors:

> Apr 5, 2022 at 6:57 PM
> [Fulton:] Just blowin me off today?
> [S.C.:] Sorry I let my phone home when I was at school and didn't see the text
> [Fulton:] Lol.. k did you delete my message? And the one you just sent

[S.C.:] No?

[Fulton:] No evidence so get rid of the message I sent you bout dieing with the lie and the one you just sent as well .... Remember always no evidence... [Laughing emoji]

[Fulton:] Missing ya and see ya when I get off.

[Fulton:] Love you too baby!

Apr 6, 2022 at 4:09 PM

[Fulton:] Thanks baby and don't mess up because of [H.C.]. Okay! Do right so that you don't end up getting in trouble as well and getting grounded and losing your phone privileges ya know? Your better then that baby.

(Ellipses in original.) When asked if she knew what evidence Fulton wanted her to destroy, S.C. responded, "Yes," "[h]e wanted me to delete anything that dealt with him saying something about alcohol or me and him doing anything that night, like going to [the store] and buying alcohol." S.C. testified that she did not delete the text messages that Fulton told her to delete.

S.C. told her mother what happened "a few weeks" after the April 3, 2022, incident. S.C. stated:

[I]t was just a lot on my shoulders and I couldn't take it anymore. So I called her into the room and I told her about what happened that night, and I told her that we drank alcohol and that he had sex with me. And she went into the bathroom and talked to him and came back, talked to me, went back to the bathroom, listened to him through the wall.

He came into the room and started telling me not to say anything and think about how my mom would feel about this and making me feel guilty about what happened. And I told him -- I was getting loud because I knew my mom was in the bathroom, so I was telling him you need to tell your side of the story. My mom came back in, started screaming at him.

After that they both went back into the backroom. He didn't come out for two weeks. And after that night they kind of dropped it, and no one actually did anything about it. After the two weeks he was staying in his room, he finally said we're just done with this; this is being dropped and we're not talking about it anymore.

S.C. said that [H.C.] was present when she told their mother what had happened. On cross-examination, S.C. said that when Fulton came out of his room after the 2 weeks, he "had all of us come in on the couch" for a family discussion and he "just said that we're dropping this whole thing." S.C. was asked if, during the family discussion with her mother and Fulton, she told them that she lied and also apologized. S.C. responded affirmatively. On redirect, when asked why she said she had lied, S.C. responded that she did not know. She said that Fulton had "sat us down and said that we had to just drop it." When asked if she made up her allegation, S.C. responded, "No, I didn't. I just went to my room after that because I knew nothing was going to get done anyways." S.C. acknowledged that after all of this occurred, she went on a family camping trip with Fulton, her mother, and her sisters; they celebrated the "Fourth of July together"; Fulton's parents from out-of-state visited for about a week; and the family celebrated Halloween together.

S.C. testified about another time prior to the April 3, 2022, incident when Fulton took her "out into the country" and "forced" her to perform oral sex on him. She subsequently agreed that this prior incident occurred "about a week before" the April 3 incident.

In November 2022, S.C. was called to the school office. When she got there, H.C. was in the office and was crying, and a police officer was there as well. The girls were taken to Capstone for interviews. S.C. testified that she told the Capstone interviewer everything that she could remember about what happened. S.C. went to live with her father on November 3.

Since being removed, S.C. has "[n]ot really" communicated with her mother, but they "had a few off and ons." The most recent communication was "by text" when S.C. asked her mother for a streaming password; "she tried to have a conversation with me, and I told her that I don't want nothing to do with her because of her taking [Fulton's] side." S.C. said, "I told her that she knew that he had raped me and he -- that he had hurt me," "[a]nd my mom straight up said that she knows that he hurt me and that he did all of this to me, but she just wanted to go back to being a happy family."

S.C. also testified about her marijuana use while living with her mother and Fulton. S.C. stated that she was not allowed to drink alcohol in the house, but she, H.C., and their mother smoked marijuana. S.C. identified exhibits 17 and 19 as pictures of "a bong" and marijuana "that we bought in Denver." S.C. could not recall when the trip occurred, but said that it was before the April 3, 2022, incident. She had been suspended from school for 10 days in March because "they could tell that we smoked weed that morning." She was 14 years old at that time. When asked if her mother or Fulton ever said anything about smoking marijuana, S.C. replied, "They just said don't do it out in public, that was the only thing; just do it in the house." Smoking in the house was "fine" and she was not reprimanded or disciplined for smoking marijuana in the house. On cross-examination, S.C. stated "there was a time" when her mother and/or Fulton told the girls that they could not smoke marijuana anymore, but "then they said we could start again after."

S.C. was asked who would dole out punishment or discipline in the home. She answered that Fulton would, and "[h]e would ground us, take away our privileges, take away to not be able to go hang out with our friends, take our phones away." When he took away their phones, he required that they provide their passcodes. S.C. was also asked about Fulton's use of the phrase "die with a lie." S.C. explained that Fulton would say that if he did not want them to say something to their mother or one of the others. "It was just a normal thing he said when he didn't want us to tell someone about something." She said it was not used as a joke, "he meant it when he said 'die with a lie.'" S.C. added that "you're not allowed to tell anyone about it or else you would get either grounded or something like that for doing it" and "[e]ven if he got in trouble for it, you would still get in trouble for it."

(b) H.C.'s Testimony

H.C., 17 years old at the time of trial, testified that Fulton is her stepfather. After her parents divorced, H.C. lived with her mother and Fulton in Alliance, Nebraska, but when she was "[p]robably" 10 years old she was removed from their care because of neglect. She then went to live with her father in Rapid City. Around the end of H.C.'s 6th grade year, the girls went to spend the summer with their mother and Fulton in Oregon. Less than 1 month later, H.C. cut her arm with a razor after an incident with Fulton where he "dragged" her into a living room and "flipped

[her] over" to get a cell phone out of her back pocket. Her mother screamed at her and pinned her against a wall, and then wrapped her arm and took her to the hospital. The girls were removed and placed into foster care "because a protection order was still up" against Fulton. The girls were subsequently allowed to go back to Rapid City with their father. In August 2021, the girls came to Gering, to live with their mother and grandmother, and "everything was good for a while up until October," when Fulton came home from prison; the girls' grandmother moved out of the home.

H.C. stated that "[i]t was okay for a while, but then [Fulton] started to slap our butts." She explained, "If we would walk past him he would slap our butt. If I was in the kitchen doing my dishes, he'd come up and hold my butt and kiss me on the cheek." H.C. told her mother, and her mother asked Fulton to stop. H.C. said that Fulton did stop "for about a week" but then the behavior resumed.

Later (date not specified), when Fulton was supposed to be at work, H.C. had "a shirt on, no bra" when she opened her bedroom door and Fulton was "standing in the doorway." She closed the bedroom door. Fulton said, "It's okay," but H.C. responded, "No, it's not okay." She waited in her room until he had left for work. H.C. said that after Fulton got home from work that day, "he pulled me out on the porch and he told me that I had nice breasts for being a young lady, and he told me about step-father and step-daughter porn," "[h]e didn't show me it, but he would talk to me about it"; it made her "[v]ery uncomfortable" but "there was really nothing [she] could do."

H.C. acknowledged saying in her deposition that Fulton wore basketball shorts without underwear. She said Fulton would come home from work, change, and then sometimes he would be "sitting on the couch playing with his junk and talk nasty" and he and her mother "would get into arguments about it." Also, when Fulton would "give us a hug and a kiss goodnight," "he'd hug us in a way to where we could feel that he was hard on your stomach"; this happened "[a]lmost every night." It went on like that "until we were taken away."

In June 2022, H.C. and S.C. told their mother "everything." H.C. said, "I told her about the butt slapping again and that it didn't stop," "I told her about him seeing my boobs and saying what he did." Their mother talked to S.C. separately, so H.C. did not know what was said between them. H.C. said:

> [Our mother] cried, and she didn't believe us. She wanted to get his side of the story.
>
> So we waited until he got home that day, and they went into the room and they fought. We could hear. We could hear that they were yelling at each other. She comes back out and I asked her what's going to happen. She said, Nothing. I said, Why? She goes, For one I love him; for two, I need help paying the bills. And I said, Well, if that's the case, I can get a job and I'll help you, and she goes, It's not that easy.

After the conversation, Fulton stayed in his room for about 2 weeks; he would "go to work, come home, and go to his room." But then "he came out of his room" and said, "'We're squashing this. This is done. We're going to go camping. We're going to be a family. I want no more drama.'"

H.C. did not tell anyone else about what was going on because she was "scared." She was scared to tell her father because of what he would do, and she did not want to "lose [her] dad" so she "just kept it a secret." When asked if Fulton was intimidating to her, H.C. replied, "Yes." She explained that Fulton's "rule was, what happens in this house stays in this house." However, on November 2, 2022, H.C. was given a class assignment to "write five things you struggle with" and

"[the teacher] asked us to be completely honest." H.C. said, "I wrote that one of the five things I struggle with is keeping myself alive and not wanting to cut, and I wrote it was because of [Fulton] and what he does to us." On November 3, the teacher told H.C. that she should talk to somebody and referred her to a school counselor. After H.C. spoke with the counselor, the school officer took H.C. and her sisters to be interviewed at Capstone. After the interviews, H.C. was placed with her grandmother and her sisters were placed with their father.

H.C. was asked who did most of the discipline when they lived with Fulton and their mother from October 2021 to November 2022. She answered that Fulton did. "He'd take our phones away. He would take friends away. He'd take the park away." Fulton knew the phone passwords. Fulton "had to have the passwords for our phones or we couldn't have a password on our phone."

H.C. said she had been allowed to smoke marijuana in the house since August 2021, when she lived with her mother, and that did not change after Fulton "got there in October." They were not disciplined for it. However, sometime shortly after February 2022, Fulton and their mother told the girls they could no longer smoke marijuana; Fulton enforced the rule, but their mother still let them "smoke in the morning."

### (c) Monica Shambaugh's Testimony

Monica Shambaugh, the executive director of the Capstone Child Advocacy Center, testified that "[a] forensic interview is basically an unbiased fact-finding interview . . . to gather information for law enforcement and child protective services." On November 3, 2022, Shambaugh conducted individual forensic interviews with H.C., S.C., and then M.C. At that time, H.C. was 17 years old and S.C. was 15 years old. Shambaugh stated,

> I don't remember [H.C.] being as emotional as [S.C.]. They both were very talkative, very direct, probably more talkative than most of the young people I have come in there. I didn't have to ask them a lot of questions. They just started, and so we just went back and filled in the blanks. That's what I recall about both of them.

Shambaugh responded affirmatively when asked if the demeanor exhibited by H.C. and S.C. was consistent with other sexual assault victims she had interviewed over the course of her career. Shambaugh did not recall if either H.C. or S.C. received a medical exam after the interview.

Shambaugh stated that "[i]t is common" for children to not disclose sexual abuse right away, some of the reasons being "not knowing that they were even assaulted, not having a trusted adult or somebody that they could talk to, telling somebody that it happened and that person not believing them." And according to Shambaugh, the way a child acts around their perpetrator is not always indicative of whether or not they have been subjected to abuse; she explained that they may have been threatened, or the "young people" may not want the perpetrator to "be in trouble."

### (d) Lieutenant Ray Huffman's Testimony

Ray Huffman, a lieutenant with the Scotts Bluff County Sheriff's Office, testified that on November 3, 2022, he went to Capstone after receiving a call from a deputy that three teenage girls were there for interviews. When Lieutenant Huffman arrived, H.C.'s interview was already completed and S.C.'s interview had started. He observed the remainder of S.C.'s interview and most of M.C.'s interview from a different room. During her interview, S.C. "appeared emotional."

Lieutenant Huffman had sat in on 20 to 50 Capstone interviews over the years. He said, "Sometimes they will be reluctant to give forth information. [S.C.] seemed a little bit that way. And she gets to a point where she's crying, so you believe that what she's relating means something to her." Lieutenant Huffman responded affirmatively when asked if, based on his training and experience, S.C.'s demeanor during her interview was consistent with other victims he had observed being interviewed. Following the interviews, the three girls were placed on a "police hold."

Fulton was arrested on November 10, 2022. A search warrant for Fulton's home was subsequently obtained and executed on November 17, and a total of eight devices (one tablet and seven cell phones) were seized. At the time of the seizure, Becky identified one of the phones (exhibit 11) as belonging to her husband, Fulton; the passcode was obtained from a jail phone call between Becky and Fulton. During the execution of the search warrant, law enforcement also seized other items, including a "glass bong for smoking marijuana," "many containers of THC concentrate, a lot from dispensaries in Colorado," pipes, lighters, and marijuana.

### (e) LaTisha Connelly's Testimony

LaTisha Connelly, a crime analyst supervisor with the Nebraska State Patrol, testified that Lieutenant Huffman sent her the eight devices (exhibits 4-11) for data extraction; however, the device in exhibit 4 "would not charge and would not respond to anything," so no data could be extracted from that device. Data was extracted from the other devices using a program called Cellebrite. A report in PDF format was attached for every device, put on a hard drive, and given to the investigator for review.

### (f) Chris Calvert's Testimony

Chris Calvert, an investigator with the Scotts Bluff County Sheriff's Office, testified that he came into the investigation in this case when the electronic devices were returned from the Nebraska State Patrol Technical Crime Division. He reviewed the hard drive containing the extractions sent by the Nebraska State Patrol and used the Cellebrite program to "look[] through videos, photos, messages, emails, anything that would be contained on the phone" identified as Fulton's. No messages telling S.C. to delete messages and get rid of evidence were found. Pictures that S.C. had testified were of the marijuana purchased on the Colorado trip were found on Fulton's phone.

Calvert stated that exhibit 26 contained "pornographic images of women" found on the phone marked as exhibit 7 (H.C., S.C., and Becky had not recognized that phone). Also found on that phone were two images of H.C. and S.C. who "appear to be nude in a bathtub together." (These two images match the photographs in exhibit 21 and 22, which S.C. testified were pictures of her and H.C. that the girls took when they were at a hotel in Nebraska. Becky claimed that those photos would have been taken "the year before last" when Fulton was in prison).

Calvert also looked at exhibit 9, which S.C. had identified as a pass-around phone; "[w]e all kind of had it at one point." The web search history on that phone included numerous searches for pornography, e.g. a search for "family porn" in November 2021, and "rape porn – Google Search" and "Helpless Teen Rape Porn Tube Videos" in January 2022. The web search history on that phone also had a search for "Infinite Campus" in December 2021. According to Calvert,

Infinite Campus is "a way for parents to check kids' grades"; "the actual URL, it's SBPS for Scottsbluff Public Schools."

(g) Becky Fulton's Testimony

Becky testified that she married Fulton in Oregon in February 2018. She stated that Fulton was born in February 1981 and was 42 years old at the time of the trial.

Becky met Fulton in late 2012 in Rapid City. In 2013, Becky, her children, and Fulton moved to Scottsbluff, Nebraska. "[A]bout a year later," Becky and her children moved to Alliance; Fulton was in jail in Scottsbluff, and he moved to Alliance after he got released. In October 2015, the girls were removed from Becky's custody and went to live with their father in Rapid City. There was a "five-year protection order" that prohibited Becky and Fulton from having contact with the girls. During that 5-year period, Becky and Fulton had "[v]ery little" contact with the girls. She said, "There was a point where their father had told us that he had to have them come live with us," and "[w]e had a notarized note from [their father] that said -- he had gotten from the courts saying that the protection order had been dropped and that they could come live with us." The girls then lived with Becky and Fulton in Oregon "for about two months" in 2020. However, "a couple months later," one of the girls "started cutting on her arm," and when Becky took her to the hospital for a mental health evaluation she was "informed that the protection order had not been dropped." In the summer of 2021 Becky moved back to Nebraska and lived with her mother. The girls "came for the summer, and then they officially came to live with me for a bit." In October, Becky and the girls moved into their own place in Gering and Fulton, who "had gotten released," moved in with them.

Becky stated that around March 2022, H.C. "pulled me aside and she said that now that the girls are getting a little older some things that might have been comfortable in the past might not be so comfortable anymore. H.C. mentioned that their bodies are changing, that they're starting to develop more." H.C. "gave an example of like the good gaming, . . . like when a person would walk up and say, like, 'good game' and give someone a slap on the butt or something like that, real innocent kind of thing." Becky said, "It didn't necessarily bother the girls, but that's the example that she gave me that some things needed to change because of their bodies."

Then in April 2022, S.C. "made some comments really out loud just kind of throughout the house," she "had called [Fulton] a pervert and said that he had tried to seduce her." S.C. did not go into details at the time. Becky spoke to Fulton, and he told her that it was not true. "[A]bout two weeks later we all sat down as a family and went over what their consequences would be and what they could mean because [S.C.] had stated that she had lied about the event and she just wanted things to go back to normal."

Becky said that the girls did not go into detail about what happened until about 2 weeks before they were removed. H.C. and S.C. called her, and they were crying.

They asked if I could come home and speak with them. They wanted me to know some things that supposedly had happened in the past, but they wanted me to hear them out.

S.C. had told me that -- [S.C.] went into detail and said [Fulton] had taken her out to a soccer field to try to seduce her. She said she felt like she couldn't get away but that

nothing had happened. She said -- [H.C.] had told me that her sister had told her about the event and that she had believed her sister but she did not witness it.

Becky stated that H.C. did not tell her about any sexual contact that she had been subject to by Fulton.

Becky identified exhibit 28 as a series of text messages between her and Fulton on April 4, 2022. Becky was aware that S.C. had not gone to school on April 4 because she was sick. The explanation Becky was given was that S.C. had stayed up late eating a bunch of candy. In one of the text messages to Fulton, Becky wrote (unedited),

See ya when you drop doodle and how Mu husband actually misses me. . . Cause I truly wonder sometimes. . . You've been so distant and I have to beg You to be intimate and last time you Even told me know. . . so yeah it hurts But I think in the end I just miss my Best fry and lover.

(Ellipses in original.) Becky explained that "doodle" was S.C., and "fry" was intended to be "friend." She added, "To be fair, this was in a context of I had been working a lot lately and my husband and I had been bickering and fighting," "[i]t was just a stress on the family, stress on my life, stress on his life."

Becky was questioned further about when S.C. told her the details of what had happened between her and Fulton. Becky claimed the first time she was given "specifics" about what had happened was just prior to the girls' removal. Becky said she then spoke to Fulton about what S.C. said, but Fulton denied it. Becky said, "about two weeks later we all sat down as a family and went over what their consequences would be and what that would mean because she had stated she had lied about the event." However, upon further questioning by the State, Becky said she talked to Fulton about what had happened in April, and then 2 weeks later they sat down as a family. Becky then confirmed that S.C. never "backed off" her statement that she made just prior to removal.

Becky testified that she never noticed any inappropriate behavior between Fulton and any of the girls. She did "see them do like the 'good game' kind of thing," but "[i]t felt innocent enough" and "[d]idn't seem to bother them."

On the second day of trial, Becky confirmed that she was aware that witnesses were sequestered and were not supposed to talk about their testimony with other witnesses. She was then confronted with exhibit 29, a copy of a conversation she had with Fulton the night before, showing that she and Fulton had discussed her testimony.

(h) Verdict

The jury found Fulton guilty of all six counts: first degree sexual assault of a child, incest under 18 years of age, third degree sexual assault (two counts), "child abuse knowingly and intentionally," and contributing to the delinquency of a child. The district court accepted the verdicts of guilty on each count. The court ordered the preparation of a presentence investigation report and set the matter for sentencing.

### 3. SENTENCING

Following a sentencing hearing on September 8, 2023, the district court entered a "Journal Entry on Sentencing." The court sentenced Fulton to: 45 to 60 years' imprisonment, including a mandatory minimum of 15 years' imprisonment, on count I (first degree sexual assault of a child); 15 to 20 years' imprisonment on count II (incest under 18 years of age); 6 to 12 months' imprisonment on both counts III and IV (third degree sexual assault); 24 to 36 months' imprisonment on count VI (child abuse, knowingly and intentionally); and 6 to 12 months' imprisonment on count VII (contributing to the delinquency of a child). The sentence in count II was "concurrent to count [I] and consecutive to Counts [III, IV, VI, and VII]." The sentences in count III, IV, VI, and VII were each consecutive to all other counts. Fulton was given 303 days' credit for time served.

Fulton appeals.

## III. ASSIGNMENTS OF ERROR

Fulton assigns, reordered, that (1) the district court deprived him of his due process rights by denying a motion to allow virtual appearances for two of his witnesses, (2) there was insufficient evidence to convict him, (3) the district court imposed a "mathematically impossible" and excessive sentence, and (4) there was prosecutorial misconduct that deprived him of a fair trial. Fulton also assigns 13 errors alleging that his trial counsel "performed deficiently" in various ways; we set forth these assigned errors more specifically later in our analysis.

## IV. STANDARD OF REVIEW

Statutory interpretation presents a question of law which an appellate court reviews independently of the lower court. *State v. Williams*, 313 Neb. 981, 987 N.W.2d 613 (2023).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. VIRTUAL APPEARANCE BY WITNESSES

Fulton claims that the district court deprived him of his due process rights when it denied his motion to allow two defense witnesses to appear via video conferencing.

Neb. Rev. Stat. § 24-734 (Cum. Supp. 2022) states in relevant part,

> (4) *In any criminal case*, with the consent of the parties, a judge may permit any witness who is to be examined by oral examination to appear by telephonic, videoconferencing, or similar methods, with any costs thereof to be taxed as costs.

> (5)(a) Unless an objection under subdivision (5)(c) of this section is sustained, *in any civil case*, a judge shall, for good cause shown, permit any witness who is to be examined by oral examination to appear by telephonic, videoconferencing, or similar methods.

> . . . .

> (c) A party may object to examination by telephonic, videoconferencing, or similar methods under subdivision (5)(a) of this section on grounds of unreliability or unfairness. The objecting party has the burden of proving unreliability or unfairness by a preponderance of the evidence.

(Emphasis supplied.)

A hearing was held on June 29, 2023, on Fulton's motions to allow witnesses Jim Fulton and Laura Fulton (his parents) to appear by Webex for the jury trial. The State confirmed its objection to the motion. When asked for authority to allow his motion, Fulton cited to § 24-734(4). Fulton acknowledged that § 24-734(4) required the consent of the parties, and that the State did not consent, but said he was making the motion "because both Jim and Laura . . . live in the state of Alabama, and it would be extremely burdensome for them to get here, as well as the expenses involved," and "[t]hey're older individuals." The district court asked if there was another provision that would allow Fulton's request since the State did not consent, and Fulton replied, "That's the only provision I can find directly on point for a criminal case. [There] is another subsection, Subsection 5, but that is specific and says to any civil case." That State responded, "There's no authority for it, and we can't do criminal trials with just phoning in the evidence[,] it just doesn't work," "[s]o that's all I'm objecting to." Fulton did not believe there would be any reliability concerns with having these two witnesses testify by videoconference that could not be addressed in the trial setting. He contended that they "personally witnessed Fulton around the alleged victims "after when these events supposedly occurred" and "would testify as to what . . . Fulton's interaction was with the alleged victims." The court took Fulton's motion under advisement, but subsequently denied the motion because the State did not consent.

On appeal, Fulton argues that § 24-734(4) "is *only* related to discovery examinations, not . . . trial" and therefore it was not applicable. Brief for appellant at 25 (emphasis in original). He contends that § 24-734(5)(a) should have been applied, and that "Judges have enumerated powers to allow video appearances, even over objection, so long as there is no showing of unfairness or reliability." Brief for appellant at 25. We disagree.

Under the plain language of the statute, § 24-734(4) applies to criminal cases and § 24-734(5)(a) applies to civil cases. There is nothing in the statutory language limiting the application of § 24-734(4) to discovery examinations. Because this is a criminal case, § 24-734(4) applies. And § 24-734(4) requires the consent of the parties before a judge may allow a witness who is to be examined by oral examination to appear by videoconferencing. The State did not consent to Fulton's two witnesses testifying by videoconference. Accordingly, the district court properly denied Fulton's motion to allow his parents to testify by videoconference at trial.

## 2. SUFFICIENCY OF EVIDENCE

Fulton contends that there was insufficient evidence to convict him. For the reasons explained below, we disagree.

### (a) First Degree Sexual Assault of Child

Fulton was convicted of first degree sexual assault of a child, S.C. As relevant here, a person commits sexual assault of a child in the first degree when he or she subjects another person who is at least 12 years of age but less than 16 years of age to sexual penetration and the actor is 25 years of age or older. § 28-319.01(1)(b). Pursuant to Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022), sexual penetration means "sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body . . . into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes."

Regarding sexual penetration, Fulton argues that "there was only a statement of the child saying that [Fulton] told her about being penetrated" and "[s]he did not recall it." Brief for appellant at 24. He adds, "Just because someone says something happened does not make it true." *Id*. However, viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Fulton's conviction. At trial, S.C. testified that on April 3, 2022, she and Fulton were drinking alcohol. She "got too drunk" and "passed out." Later, she woke up on the couch, was naked, had "vomit" on and underneath her face, and her vagina and anus were "really sore." She asked Fulton what happened, and he told her that they had sex on the couch and that he put his finger in her anus when they had sex. He also told her that they had oral sex and he "pushed [her] head too far down . . . and [she] threw up on him and passed out on the couch." S.C. also testified about a prior incident when Fulton "forced" her to perform oral sex on him. Any one of the acts testified to by S.C.--the fellatio, Fulton's digital penetration of S.C.'s anus, or any penetration of her vagina--meets the definition of sexual penetration for purposes of § 28-319.01. And based on the evidence presented at trial, S.C. was 14 years old on April 3, and Fulton was 41 years old. When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of first degree sexual assault of a child beyond a reasonable doubt.

### (b) Incest

Fulton was convicted of incest, and S.C. was the named victim. Section 28-703(1) states that "[a]ny person who shall knowingly intermarry or engage in sexual penetration with any person who falls within the degrees of consanguinity set forth in section 28-702 or any person who

engages in sexual penetration with his or her stepchild who is under nineteen years of age commits incest."

We have already found that a rational fact finder could have found that Fulton subjected S.C. to sexual penetration when she was under 19 years of age. And it was undisputed at trial that Fulton was S.C.'s stepfather. Accordingly, when viewed in the light most favorable to the prosecution, the evidence was sufficient such that a rational fact finder could have found the essential elements of the crime of incest beyond a reasonable doubt.

(c) Third Degree Sexual Assault

Fulton was convicted of two counts of third degree sexual assault; S.C. and H.C. were the named victims. Section 28-320 states:

> (1) Any person who subjects another person to sexual contact (a) without consent of the victim, or (b) who knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault in either the second degree or third degree.
>
> . . . .
>
> (3) Sexual assault shall be in the third degree . . . if the actor shall not have caused serious personal injury to the victim.

Pursuant to § 28-318(5),

> Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact also includes the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual abuse by a school employee under section 28-316.01 or sexual assault of a child under sections 28-319.01 and 28-320.01[.]

Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts. § 28-318(2). Fulton argues that there was "no evidence that the slapping on the buttocks or the hugging was done for the purpose of sexual arousal or gratification of either party." Brief for appellant at 24. We disagree. S.C. testified that Fulton "started touching us and groping on us." She explained that Fulton "usually wore like really thin basketball shorts and a t-shirt," and he would hug the girls and pull them in and "rub everything against us," meaning he was "rubbing his penis against our legs." He would pull them "in tight and slap [their] butts when he walked by" and would "comment on their clothing and just . . . he was very sexual about it." This happened anytime he gave them a hug goodbye or just good night," and it happened "every single day." H.C. also talked about Fulton wearing basketball shorts without underwear, and that when Fulton would "give us a hug and a kiss goodnight," "he'd hug us in a way to where we could feel that he was hard on your stomach"; this happened "[a]lmost every night." Additionally, H.C. stated that Fulton "started to

- 14 -

slap our butts." "If we would walk past him he would slap our butt. If I was in the kitchen doing my dishes, he'd come up and hold my butt and kiss me on the cheek." H.C. told her mother, and her mother asked Fulton to stop; Fulton did stop "for about a week" but then the behavior resumed.

Based on the girls' testimony, a rational trier of fact could have found beyond a reasonable doubt that Fulton subjected them to sexual contact without their consent--either by slapping their clothed buttocks, hugging them in a way that his "hard" penis could be felt through his shorts pressing on their stomachs, or by hugging them while rubbing his penis on their legs. And a rational trier of fact could reasonably construe Fulton's sexual contact with S.C. and H.C. as being for the purpose of sexual arousal or gratification, given their description of his penis being "hard" or that he rubbed it against them. Moreover, H.C. testified that Fulton told her she had nice breasts, and both H.C. and S.C. testified that Fulton either talked to them about or showed them stepfather and stepdaughter pornography. Therefore, when viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of third degree sexual assault (two counts) beyond a reasonable doubt.

### (d) Child Abuse

Fulton was convicted of "child abuse knowingly and intentionally," S.C. was the named victim. As relevant here, § 28-707 states:

> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
> (a) Placed in a situation that endangers his or her life or physical or mental health; . . . [or]
> (e) Placed in a situation to be sexually abused as defined in section 28-319, 28-319.01, or 28-320.01[.]

We have already found that there was sufficient evidence to support Fulton's conviction of first degree sexual assault of a child, S.C., under § 28-319.01. The same facts that support Fulton's conviction for first degree sexual assault of a child, also support his conviction for child abuse.

### (e) Contributing to Delinquency of Child

Fulton was convicted of contributing to the delinquency of a child, S.C. Pursuant to § 28-709,

> (1) Any person who, by any act, encourages, causes, or contributes to the delinquency or need for special supervision of a child under eighteen years of age, so that such child becomes, or will tend to become, a delinquent child, or a child in need of special supervision, commits contributing to the delinquency of a child.
> (2) The following definitions shall be applicable to this section:
> (a) Delinquent child shall mean any child under the age of eighteen years who has violated any law of the state or any city or village ordinance; and
> (b) A child in need of special supervision shall mean any child under the age of eighteen years (i) who, by reason of being wayward or habitually disobedient, is uncontrolled by his parent, guardian, or custodian; (ii) who is habitually truant from school

or home; or (iii) who deports himself so as to injure or endanger seriously the morals or health of himself or others.

Section 28-709 is addressed to the conduct of the person accused of contributing to the delinquency of a child, not the conduct of the child. *State v. Brister*, 231 Neb. 263, 435 N.W.2d 679 (1989). "The statute does not require that the child actually become delinquent or in need of special supervision, but only that the defendant encourage the child to become delinquent or to need special supervision so that the child will 'tend to become a delinquent child, or a child in need of special supervision.'" *Id.* at 266, 435 N.W.2d at 681.

Fulton argues that he "did not purchase nor allow[] the girls to use marijuana; their mother was the one who allowed them to smoke marijuana." Brief for appellant at 24. His argument goes to the weight of the evidence and the credibility of the witnesses. See *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact).

H.C. and S.C. testified that they were allowed to smoke marijuana in the home. Additionally, S.C., who was under the age of 18 at the time of trial, testified that she was suspended from school for 10 days because "they could tell that we smoked weed that morning." When asked if her mother or Fulton ever said anything about smoking marijuana, S.C. replied, "They just said don't do it out in public, that was the only thing; just do it in the house." Smoking in the house was "fine" and she was not reprimanded or disciplined for smoking marijuana in the house. S.C. stated that "there was a time" when her mother and/or Fulton told the girls that they could not smoke marijuana anymore, but "then they said we could start again after." A rational trier of fact could find that Fulton's allowance of marijuana use had the effect of encouraging S.C. to deport herself so as to injure or endanger seriously her morals; such action would tend to make S.C. become a child in need of special supervision.

In addition to the testimony about the girls' marijuana use, S.C. testified that she and Fulton bought alcohol on April 3, 2022, and drank together; she "got too drunk" and "passed out." Again, a rational trier of fact could find that by obtaining alcohol and drinking with S.C. until she "passed out," Fulton was encouraging S.C. to deport herself so as to injure or endanger seriously her morals; such action would tend to make S.C. become a child in need of special supervision.

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Fulton's conviction of contributing to the delinquency of a child.

3. EXCESSIVE SENTENCE

Fulton claims that the district court imposed a "mathematically impossible" and excessive sentence. Brief for appellant at 7. Fulton does not claim that any of the sentences fell outside the statutory sentencing ranges. We therefore review the district court's sentencing determination only for an abuse of discretion. See *State v. Stack, supra*. We first discuss our conclusion that there was no abuse of discretion in the sentences ordered, and we then address Fulton's argument related to mathematical impossibility.

(a) No Abuse of Discretion

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *Id.* In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.*

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). For a defendant who has been sentenced consecutively for two or more crimes, we generally consider the aggregate sentence to determine if it is excessive. *Id.*

Fulton argues that he had "no prior convictions in his criminal record of assault, let alone sexual assault," "does not show a pattern of this type of behavior," and "could have been rehabilitated by probation programs." Brief for appellant at 27. He contends he should have been sentenced to "only the minimum of 15 years." *Id*. He argues that the factors set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2016) show that he "clearly qualified for probation for those crimes that did not have a mandatory minimum." Brief for appellant at 28. He notes that the children were removed from their mother's care, "so he would not have access to the children." *Id*.

Fulton was 42 years old at the time of sentencing. According to the presentence investigation report, he was married to Becky. Fulton had four children from prior relationships, but currently had no relationship with those children. He had a GED and was unemployed due to his incarceration.

Fulton's criminal history includes convictions for "Ingest Intoxicant Other Than Alcohol" in 2002 (30 days' jail, suspended); "Possess Two Ounces of Marijuana Or Less" and "Use or Possession Of Drug Paraphernalia" in 2008 (30 days' jail, suspended); "Attempt Of A Class III felony" in 2013 (170 days' jail); "Possess Controlled Substance" in 2016 (180 days' jail and 9 months' post-release supervision, released unsatisfactorily); "Theft-2nd Degree" in 2017 (12 months' probation and fine); "Penalties for Firearms" in 2020 (366 days' incarceration with Federal Bureau of Prisons and 36 months' federal probation).

On the "Level of Service Case Management Inventory" conducted by probation, Fulton scored in the medium high risk to reoffend. The probation officer noted that Fulton maintained his innocence regarding the current charges and believed the case should have been dismissed for lack of physical evidence; Fulton "blamed" his stepdaughters and said they "lied."

At sentencing, Fulton's attorney requested the minimum sentence on count I and that all sentences run concurrently. He pointed out that Fulton did not have any criminal history similar to the allegations in this case and that "he scored moderate/low on the VASOR II SOTIPS," which counsel believed was "a good indicator that [Fulton] doesn't necessarily need to spend any more

than the minimum amount of time here." Counsel also "[found] it telling that [Fulton] has maintained a good relationship with his wife throughout this" and that she submitted a support letter to the district court.

Fulton personally addressed the district court stating that there was "no evidence against [him] except the false testimonies that were collaborated by my wife's children." And Fulton asked the court to take into account that "regardless of my minor mistakes I made in the past, none of which have ever been charges of this caliber," the character letters show that "these charges are not the man that I am."

The State argued that this case involved a "fairly egregious assault on a step-daughter who . . . was 14 at the time" and other sexual assaults that were "lesser felonies." Fulton "seems to blame everyone but himself." The State noted that Fulton, despite the order to sequester witnesses, spoke to his wife during trial about her testimony; "it is witness tampering." The State also noted that Fulton had three prior felony convictions in the last 10 years. The State did not believe that a minimum sentence was appropriate in this case, and "a substantial sentence over and above that is necessary."

The district court noted Fulton's age, his other children with whom he did not currently have a relationship, his prior criminal history which it described as "moderate," and that he scored in the medium to high risk to reoffend. The court said it had reviewed the police reports, the letters in support of Fulton, and the victim impact statements, and noted that as the presiding judge at the jury trial it had the opportunity to listen to the victims and other witnesses testify. It observed that the victims would "have to bear the pain of the offenses for the rest of their lifetime" and "were taken advantage of by their step-father who has up to yet today continued to show a lack of responsibility for his actions in this case." The court, referencing the text message from Fulton to one of the victims indicating she needed to die with a lie, said, "Well, in this case, I find that the truth has set the victims free and that justice will best be served through a term of lengthy incarceration in this case." The court then sentenced Fulton as previously set forth.

Having considered the relevant factors in this case, we cannot say that the district court abused its discretion when it sentenced Fulton. See *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court). Although the aggregate minimum sentence of 48½ years of imprisonment (including mandatory minimum of 15 years) is lengthy, we cannot say that it is untenable given the nature of these sexual offenses involving his stepdaughters.

(b) No Mathematical Error

The district court's written sentencing order states that the sentence in count II was "concurrent to count [I] and consecutive to Counts [III, IV, VI, and VII]." Fulton contends such a sentence is "mathematically impossible" to impose because "Count II cannot be run after Counts III, IV, VI and VI [sic] when it is to run concurrent with Count I." Brief for appellant at 29. He appears to be arguing that since counts I and II are to run concurrently with each other, then the court could not require count II to be run consecutively to the remaining counts, which he interprets to mean "after" the remaining counts have been served. However, Fulton provides no authority for such a limited interpretation of the trial court's phrasing, nor does the record support it.

At the sentencing hearing, the district court stated that the "sentences on Counts [I] and [II] will run concurrent to each other" and "consecutive to Counts [III, IV, VI, and VII]." The court further stated that the "sentences in [III, IV, VI, and VII] will also be served consecutive to each other as well." For its "Truth in Sentencing," the court stated,

> Counts [I] and [II] have a total of 45 to 60 years to be served consecutive to [III, IV, VI, and VII.] When those counts are added together, that's a total of an additional 42 to 72 months or 3 1/2 to six years. When adding that total to the 45 to 60, that leaves a grand total between 48 1/2 years to 66 years.
>
> Count [I] has a mandatory minimum of 15 years, so with all good time credit awarded to [Fulton], he would serve between 31 3/4 years to 40 1/2 years. . . . If the Department of Corrections calculates it differently their figures will control.

It is evident that the district court expected the sentences in counts III, IV, VI, and VII to be served consecutively to each other and after the concurrent sentences ordered in counts I and II. The court's written order that the sentence in count II was "concurrent to count [I] and consecutive to Counts [III, IV, VI, and VII]" is not inconsistent with its oral pronouncement. We agree with the State's observation that,

> While it may have been clearer for the court to specify that the consecutive terms of imprisonment imposed for counts [III, IV, VI, and VII] would be consecutive to counts [I] and [II], implying that the concurrent sentences under counts [I] and [II] were to be served first with the mandatory minimum, it is not an error for how the court worded it, and any possible confusion was cleared up when the court reiterated that [Fulton's] total imprisonment would be 48 1/2 to 66 years.

Brief for appellee at 36. We find no error in the court's sentencing order.

### 4. PROSECUTORIAL MISCONDUCT

Fulton assigns as error that "[t]here was prosecutorial misconduct that deprived [him] of a fair trial." Brief for appellant at 7. He argues that the State: (1) "knowingly subpoenaed and intentionally used a witness [(Connelly)] that was not endorsed as required under the statutes nor had any consent by [Fulton] or authorization by the lower court to use such witness"; (2) "knowingly asked about text messages [found in exhibits 24 and 25] and their direct verbiage on the record, not once, but twice, even after the first time getting the exhibit[s] excluded from the jury's view"; and (3) "knowingly used text messages between [Fulton] and his wife in violation of" Neb. Rev. Stat. § 27-505(1) (Reissue 2016). Brief for appellant at 25-27.

Fulton did not object to any of the foregoing actions by the State during trial. The failure to timely assert an objection on the basis of alleged prosecutorial misconduct amounts to a forfeiture of the right to appellate review of the issue, but an appellate court still has the discretion to notice plain error. See *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024). Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Horne*, 315 Neb. 766, 1 N.W.3d 457 (2024).

Prosecutorial misconduct "encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial." *State v. Gleaton*, 316 Neb. at 135, 3 N.W.3d at 349. Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id.* A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id.* But if we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial. *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *Id.* Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *Id.* In determining whether the conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction. *Id.*

(a) Unendorsed Witness

We find no plain error as to Fulton's claim that the State "knowingly subpoenaed and intentionally used a witness [(Connelly)] that was not endorsed as required under the statutes nor had any consent by [Fulton] or authorization by the lower court to use such witness." Brief for appellant at 25.

Neb. Rev. Stat. § 29-1602 (Reissue 2016) provides that a prosecuting attorney shall endorse on the information the names of witnesses known at the time of filing, and once an information is filed, "the prosecuting attorney shall endorse on the information the names of such other witnesses as shall then be known to him or her as the court in its discretion may prescribe." The purpose of § 29-1602 is to notify the defendant as to witnesses who may testify and provide an opportunity to investigate them. *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024).

The State filed the information on December 1, 2022, and Connelly was not listed as a witness. However, on March 27, 2023, the State filed a "Motion to Endorse Witness" Connelly, and on June 20, the State filed its "Pre-Trial Compliance" wherein Connelly was disclosed as one of the witnesses. Our record does not reflect whether the district court granted the State's motion to endorse Connelly. But, in an order entered on June 26, the district court set the case for trial and stated, "Unless otherwise ordered by the Court, the case will proceed to trial based on the pretrial materials which have been supplied to the trial judge"; the court also stated, "There are no pending motions." The State subsequently filed an amended information on July 5, but Connelly was not listed as a witness. Connelly testified at trial on July 12.

Here, Fulton had notice of witness Connelly prior to trial and therefore had the opportunity to investigate her. We find no plain error in the prosecutor's use of Connelly as a witness at trial.

### (b) Questions Regarding Exhibits 24 and 25

As to Fulton's claim regarding the State's references to text messages found in exhibits 24 and 25, we find no plain error. Fulton particularly takes issue with the prosecutor's use of the word "rape" when asking about the text messages. However, S.C. had already testified that she told her mother "by text" that Fulton "raped" her and "hurt" her, and that her mother acknowledged it; she identified exhibits 24 and 25 as screenshots of their communication. It was not until after that testimony by S.C. that the State offered exhibits 24 and 25 into evidence, and the district court sustained Fulton's objections to the exhibits because of a discovery violation. While the State did ask Becky about the text messages, and whether she recalled S.C. telling her that Fulton had "raped" her, S.C. had already testified to such. Thus, even if the prosecutor's questioning of Becky constituted misconduct, it did not prejudice Fulton's right to a fair trial.

### (c) Husband-Wife Privilege

As to Fulton's claim regarding § 27-505(1), we find no plain error. Section 27-505 sets forth the husband-wife privilege regarding confidential communications, but the privilege "may not be claimed" "in any criminal case where the crime charged is a crime of violence, bigamy, incest, or any crime committed by one against the person or property of the other or of a child of either[.]" § 27-505(3)(a). Fulton was charged with incest and other crimes that constituted a "crime committed by one against . . . a child of either." Accordingly, the privilege did not apply in this case.

### 5. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Fulton's appellate counsel is different from his trial counsel. We have retained the alphabetic sequencing used in Fulton's assignments of error section to address each of his 13 ineffective assistance of trial counsel claims. Fulton assigns that his trial counsel performed deficiently by failing to: A, "secure certain witnesses via video conferencing that could have aided in [his] defense"; B, object to Connelly's testimony as she was not an endorsed witness; C, "object to Investigator Calvert's use of text messages and testimony"; D, "limit or eliminate text messages prior to and during trial"; E, object to Lieutenant Huffman's testimony as to state of mind/honesty of the children; F, "try to eliminate or limit use of testimony about drug paraphernalia in the home"; G, object to an improper impeachment and rehabilitation of S.C.; H, "eliminate, limit the use of or object to certain pictures and text messages located on an electronic device"; I, "eliminate or limit the use of or object to testimony about prior bad acts"; J, object to an improper impeachment and rehabilitation of Becky; K, object to hearsay as to what the children said to their mother and not striking it for the jury; L, "depose, limit her testimony by pretrial motion, object to and call for immediate *Daubert* examination of the Capstone interviewer during trial"; and M, file a motion for directed verdict. Brief for appellant at 6.

### (a) General Principles of Law

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally

barred in a subsequent postconviction proceeding. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.* In *State v. Mrza*, 302 Neb. 931, 935, 926 N.W.2d 79, 86 (2019), the Nebraska Supreme Court stated, "We now hold that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity."

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *State v. Dap, supra.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Collins*, 307 Neb. 581, 950 N.W.2d 89 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

With these standards and general principles in place, we turn to the deficiencies alleged by Fulton.

(b) Claims Previously Addressed or
Not Sufficiently Assigned or Argued

We begin with assigned errors A, C, D, H, I, and L, that all fail either because we have already addressed the issue raised earlier in this opinion, or they do not contain the particularity required in the assignments of error section of Fulton's brief, or the errors are not sufficiently developed and argued. See, *State v. Mrza, supra* (assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and appellate court will not scour remainder of brief in search of such specificity); *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022) (arguments conclusory in nature are insufficiently stated; failure to explain with sufficient particularity what statements and what evidence should have been suppressed or excluded or on what grounds fails to sufficiently allege deficient performance).

In assigned error "A," Fulton contends that his trial counsel performed deficiently by failing to "secure *certain witnesses* via video conferencing that could have aided in [Fulton's] defense." Brief for appellant at 6 (emphasis supplied). However, neither in his assigned error nor

in his argument does Fulton specifically identify the witnesses trial counsel failed to secure via video conference. Although we can discern that he is referring to his parents based upon our earlier discussion, we nevertheless conclude that this claim fails because as we discussed previously, § 24-734(4) applies to criminal cases and § 24-734(5)(a) applies to civil cases. And § 24-734(4) requires the consent of the parties before a judge may allow a witness who is to be examined by oral examination to appear by videoconferencing. Trial counsel cannot be deficient for failing to argue inapplicable law in support of the request for videoconferencing.

In assigned error "C," Fulton claims trial counsel was deficient for failing to "object to Investigator Calvert's use of *text messages and testimony*." Brief for appellant at 6 (emphasis supplied). However, Fulton does not specifically identify the text messages and testimony used by Investigator Calvert that should have been objected to and on what basis the objections should have been made. Merely including page and line numbers in parentheticals is insufficient to meet the requirement that deficient performance must be sufficiently alleged and argued. See *State v. Blake, supra*.

In assigned error "D," Fulton contends trial counsel was deficient for failing to "limit or eliminate text messages prior to and during trial." Brief for appellant at 6. In his argument, he generally refers to the messages between himself and his wife and claims they were protected by spousal privilege. However, we previously addressed that issue and found that the spousal privilege did not apply in this case; trial counsel cannot be deficient for failing to object on this basis. Fulton also generally refers to messages between himself and S.C. about the "stretch of 'leaving no evidence,'" related to her having alcohol. *Id*. at 18. Even though we can discern which text messages he may be referencing, Fulton nevertheless fails to address by what means and on what basis such evidence could have been excluded. Regardless, Fulton could not establish prejudice since, as already discussed, the substance of the messages had already been discussed during S.C.'s testimony.

In assigned error "H," Fulton claims that trial counsel failed to "eliminate, limit the use of or object to *certain pictures and text messages located on an electronic device.*" Brief for appellant at 6 (emphasis supplied). Although his assigned error does not specifically identify the pictures and text messages that should have been limited or eliminated and on which of the numerous seized electronic devices they were located, his argument provides some further information. He generally refers to "pictures of the girls in the bathtub," which he claims lacked foundation and were irrelevant because Fulton was not present at the time and "no one knew how these pictures were found on a device that no one could recognize." *Id*. at 19. He also generally refers to an inadequate objection to "texts between the child and her mother," and refers to the "State's second attempt to admit the text messages, which had very inflammatory language to 'prove' the sexual assault." *Id*. at 20. While Fulton makes general references to various objections that should have been made, he does not develop his argument as to any of them. Regardless, even if we accepted these claims as being sufficiently stated and argued, Fulton would not be able to establish prejudice because there were witnesses who testified who either could or did establish foundation or relevance for the pictures received into evidence, and with regard to the text messages between S.C. and her mother, we have already addressed that S.C. testified about the same content contained in the text messages between them.

In assigned error "I," Fulton claims trial counsel failed to "eliminate or limit the use of or object to *testimony about prior bad acts.*" Brief for appellant at 6 (emphasis supplied). Fulton does not specifically identify in his assigned error whose testimony and what prior bad acts should have been objected to, limited, or eliminated. In his argument, he references generally H.C.'s testimony about "cutting herself" and what Fulton "did or did not do while in Oregon." *Id.* at 20. He claims that "[t]his prior bad acts evidence . . . should have been attempted to be limited." *Id.* He also claims the "acts testified to in Oregon were not even remotely similar to the allegations" in Nebraska "to be relevant." *Id.* Fulton also takes issue with references to his "jail stints" and the "lack of intimacy" with his wife. *Id.* He argues this was a "clear, direct attack on character without the proper use of 608, but more so under 404 prior bad acts hearing that never took place." *Id.* And he again makes the spousal privilege argument. Fulton fails to develop his argument as to how any of this evidence qualifies as a prior bad act and on what basis any such objection would have been sustained; his arguments are conclusory in nature and are therefore insufficiently stated. See *State v. Blake, supra*.

In assigned error "L," Fulton alleges that his trial counsel performed deficiently by failing to "depose, limit her testimony by pretrial motion, object to and call for immediate *Daubert* examination of the Capstone interviewer during trial." Brief for appellant at 6. In his argument, Fulton again makes conclusory statements about trial counsel's deficiencies related to Shambaugh's testimony. Fulton does not specify what pretrial motion trial counsel should have filed, or what testimony by Shambaugh that trial counsel should have sought to limit prior to trial. Additionally, Fulton does not specify what objections trial counsel should have made to any specific testimony by Shambaugh at trial, or what testimony should have been subjected to *Daubert* examination. He suggests that Shambaugh's testimony was "specifically used to assert truthfulness of the complainants," brief for appellant at 23, but does not point to specific testimony where this was done. This claim of ineffective assistance of trial counsel fails because it is insufficiently developed and is conclusory in nature. See *State v. Blake, supra*. Notably, although Shambaugh spoke about the demeanor of H.C. and S.C. being consistent with other sexual assault victims, she confirmed that during an interview, she is not trying to confirm sexual abuse; rather, she is a "finder[] of information." Further, both H.C. and S.C. testified, so any matters related to their credibility were available to the jury firsthand during direct and cross-examination. Therefore, even if this claim was sufficiently raised, Fulton would not be able to establish prejudice because he would not be able to show a reasonable probability that but for counsel's alleged deficient performance, the result of the proceeding would have been different.

(c) Remaining Ineffective of Assistance of Trial Counsel Claims

*(i) Unendorsed Witness*

In assigned error "B," Fulton claims his trial counsel performed deficiently by failing to object to Connelly's testimony as she was not an endorsed witness. We previously addressed that the purpose of § 29-1602 is to notify the defendant as to witnesses who may testify and provide an opportunity to investigate them. *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024). Fulton had notice of Connelly as a witness prior to trial. As previously discussed, the State filed a "Motion to Endorse Witness" Connelly on March 27, 2023, and again disclosed Connelly as a witness on June 20 when the State filed its "Pre-Trial Compliance." Because Fulton's trial counsel had notice of

Connelly as a witness prior to trial, and had an opportunity to investigate her, counsel did not perform deficiently by failing to object to Connelly's testimony. See *State v. Morris*, No. A-21-841, 2022 WL 4137700 (Neb. App. Sept. 13, 2022) (selected for posting to court website) (trial counsel was not ineffective for failing to object to testimony of unendorsed witnesses nor was defendant prejudiced by any such failure since trial counsel had notice of such witnesses prior to trial). This claim of ineffective assistance of trial counsel fails.

### (ii) Huffman's Testimony

In assigned error "E," Fulton claims his trial counsel performed deficiently by failing to object to Lieutenant Huffman's testimony as to state of mind/honesty of the children. Fulton argues that "there was no objection on what one of the girls said and 'its meaning to her' and, 'whether the behavior is consistent during such interview' as irrelevant, hearsay and foundation for state of mind." Brief for appellant at 18.

Initially we note that Fulton does not specify which "one of the girls" his argument is referencing. Regardless, at trial, Lieutenant Huffman testified that he had observed 20 to 50 Capstone interviews over the years. In this case, by the time he got to Capstone, H.C.'s interview was already completed, and he observed the remainder of S.C.'s interview and most of M.C.'s interview. Lieutenant Huffman was asked what he observed during S.C.'s interview and to describe her demeanor. He responded, "She appeared emotional. Sometimes they will be reluctant to give forth information. [S.C.] seemed a little bit that way. And she gets to a point where she's crying, so you believe that what she's relating means something to her." Lieutenant Huffman was asked if, based on his training and experience, S.C.'s demeanor during her interview was consistent with other victims he had observed being interviewed; he responded, "Yes." Following the interviews, the three girls were placed on a "police hold."

Even if trial counsel was deficient by failing to object to Lieutenant Huffman's testimony, Fulton would not be able to show prejudice because he would not be able to show a reasonable probability that but for counsel's alleged deficient performance, the result of the proceeding would have been different. Both S.C. and H.C. testified at trial about what Fulton had done to them, and the jury had the opportunity to personally observe them and weigh their credibility.

Fulton also asserts that Lieutenant Huffman "laid foundation for '48-hour holds'" and trial counsel allowed this testimony and admitted these exhibits without objection. Brief for appellant at 18. Fulton cannot show prejudice regarding Lieutenant Huffman's foundation testimony for the 48-hour holds, because the exhibits containing the hold forms themselves (one for each of the three girls) were admitted into evidence without objection. And Fulton did not specifically assign the admission of these exhibits as error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024).

### (iii) Testimony About Drug Paraphernalia

In assigned error "F," Fulton claims his trial counsel performed deficiently by failing to eliminate or limit the use of testimony about drug paraphernalia in the home. He argues that "[t]here were no charges of possession of drugs or paraphernalia, yet, it was discussed at trial apparently in a way to show contributing to the delinquency." Brief for appellant at 18. And

"[w]hat's worse is that the testimony was that [S.C.], her mother and [H.C.] purchased and smoked marijuana, <u>not</u> [<u>Fulton</u>], and there was nothing that showed [Fulton] provided the marijuana[.]" *Id.* at 18-19 (emphasis in original). In response, the State submits that Fulton cannot establish prejudice. We agree.

The testimony about drug paraphernalia was relevant to the contributing to the delinquency of a child charge. As pointed out by the State, "[Fulton] focuses his argument on why that evidence was not sufficient to convict him," but "[t]his does not mean that the evidence was inadmissible." Brief for appellee at 44. The jury was presented with evidence that Fulton was not the one that purchased the marijuana and was able to consider that testimony during its deliberations. However, the jury still chose to convict Fulton of contributing to the delinquency of a child. And we have already found that there was sufficient evidence to support that conviction. Because Fulton would not be able to show he was prejudiced by trial counsel's failure to limit or eliminate the testimony about drug paraphernalia in the home, his claim fails.

Fulton also argues that a "pretrial motion . . . should have been filed to limit or eliminate the use of the messages for trial" and that the "messages were irrelevant and confusing to the jury." Brief for appellant at 19. However, he does not specify what messages he is referencing. In order to know whether the record is sufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity for an appellate court to make a determination of whether the claim can be decided upon the trial record and for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. See *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). Without directing us to the specific messages applicable to this claim of deficient conduct, Fulton's general allegation is insufficient to preserve this claim.

*(iv) Impeachment and Rehabilitation of S.C.*

In assigned error "G," Fulton claims his trial counsel performed deficiently by failing to object to an improper impeachment and rehabilitation of S.C. He argues that trial counsel tried to impeach S.C. but was not successful. Then, on redirect, "rather than trying to rehabilitate [S.C.] properly, the State just read in the deposition without any objection by [trial] counsel," and "some of the information read verbatim by the prosecutor was not even subject to cross examination, and vital to the [S]tate's case, yet there was no objection to improper redirect or relevance and request to strike." Brief for appellant at 19.

As noted by the State, because trial counsel was the one who tried to impeach S.C. on cross-examination, trial counsel could not have failed to object to improper impeachment. Thus, Fulton's claim that trial counsel failed to object to an improper impeachment fails.

As for trial counsel's failure to object to an improper rehabilitation of S.C.,

The State submits that Fulton cannot establish prejudice as to [trial] counsel failing to object to the State's redirect examination of S.C. because S.C. indicated she did not have a good recollection of her testimony from her deposition, the quoting of the deposition was on the same subject matter that defense counsel asked specifically about on cross-examination, counsel was attacking her credibility by questioning whether S.C.'s deposition testimony was consistent with her trial testimony, and the State's redirect was

simply clarifying specifically S.C.'s statements at her deposition which was consistent with her testimony at trial.

Brief for appellee at 45.

We agree with the State that Fulton would not be able to show prejudice. On redirect, the State read portions of S.C.'s deposition testimony that had been asked about on cross-examination. Upon hearing the testimony from her deposition, S.C. confirmed that she recalled those questions and answers. She also agreed that her answers from her deposition were consistent with her testimony at trial. Because Fulton would not be able to show prejudice, this claim of ineffective of assistance of trial counsel fails.

### (v) Impeachment and Rehabilitation of Becky

In assigned error "J," Fulton claims his trial counsel performed deficiently by failing to object to an improper impeachment and rehabilitation of Becky. However, as noted by the State, Fulton does not make any argument regarding the rehabilitation of Becky. See *State v. Clark, supra* (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court). We therefore do not address that portion of this assigned error.

As to trial counsel's failure to object to an improper impeachment of Becky, Fulton argues that on Becky's second day of testimony, the State's attempt to impeach her was improper. "[T]he questions were not asked, denials or lack of recollection entered," and "commitment to the answer before using the prior sworn testimony to get the hearsay testimony that the State wanted." Brief for appellant at 21. "The State just simply started reading in her deposition and asked 'yes or no' questions to her hearsay statements," and trial counsel failed to object as improper impeachment under Neb. Rev. Stat. § 27-613 (Reissue 2016). Brief for appellant at 21.

Section 27-613(2) states in relevant part,

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.

On the first day of trial, the State conducted its direct examination of Becky. Becky was asked about when she learned the details of what had happened between S.C. and Fulton. Becky testified that at the beginning of April 2022, S.C. "made some comments" that Fulton was "a pervert" and had "tried to seduce her," but that S.C. did not go into detail. And then "right before [the girls] had gotten taken," S.C. and H.C. wanted to talk to Becky; S.C. "went into detail and said [Fulton] had taken her out to a soccer field to try to seduce her" and H.C. "told me that her sister had told her about the event and that she had believed her sister but she did not witness it." Becky confirmed that the first time she was given "specifics" about what had happened was just prior to the girls' removal. Becky said she spoke to Fulton about what S.C. said, but Fulton denied it. Then, "about two weeks later we all sat down as a family and went over what their consequences would be and what that would mean because [S.C.] had stated she had lied about the event." Upon further questioning by the State, Becky said she talked to Fulton about what had happened in April,

and then 2 weeks later they sat down as a family. Becky then confirmed that S.C. never "backed off" her statement that she made just prior to removal.

On the second day of trial, the State continued with its direct examination of Becky by discussing her deposition testimony. The State read sections from the deposition where Becky testified about when she found out about what had happened between S.C. and Fulton, and Becky was asked if she recalled the questions and her answers. We include that here:

**Q** [by the State]**.** Ms. Fulton, I want to go back and discuss testimony from your deposition, okay?

**A** [Becky]**.** Okay.

**Q.** And that was June 15, I believe, so about a month ago, right?

. . . .

**A.** Yes.

**Q.** Do you remember me asking you on page 47 starting at line 21, Question: She told you or she and [H.C.] mentioned the incident at the soccer field, and that was about two weeks before they were removed from your custody?

Your answer: I believe so. I believe so. That's when it came all out about the situation.

Do you recall those questions and answers?

. . . .

**A.** Yeah. That's when they went into detail about what had happened.

**Q.** And I'm just going to ask you if you recall your sworn testimony --

**A.** Yes.

**Q.** -- and either you remember it or you don't.

**A.** All right.

**Q.** Then on page 49 starting on line 16: Did either [S.C.] or [H.C.] mention anything about an incident that occurred . . . in April 2022?

Your answer: They never mentioned. I know [S.C.] got sick during that time. I don't know of anything that happened during that time.

My question: You weren't told anything?

Answer: I don't remember being told anything.

Do you remember those questions and answers?

**A.** Yes.

**Q.** And then I asked about the incident where [S.C.] said that she had passed out drunk and the defendant had sexually assaulted her, and I asked: Is this the first time you're hearing of this?

Your answer: It's not the first time. I've heard of it. Do you recall that?

. . . .

**Q.** That's what you said?

**A.** Yes.

**Q.** So then I went and asked you about that incident and the incident at the soccer field. And my question was: So those two incidents, did [S.C.] -- [S.C.] told you about both of those?

Your answer: Her and [H.C.]

Question: And you said this was a conversation you had about two weeks before they were taken out of your custody?

Your answer: Yes, when I heard or when I had found out.

Do you recall those questions and answers?

A. Yes.

Q. Again, going to page 65 starting at line 7, I asked: When she actually made -- referring to [S.C.]. When she actually made the allegations of sexual assault, that was two weeks before they were taken out of your custody?

Your answer: That's when I found out everything, yes.

My question: The earlier conversation where you had the family together, I take it [Fulton] was there, right?

Your answer: Yes.

My question: On that occasion she said that she had lied about some things but didn't say what it was?

Your answer: I don't remember her being very specific. She had been acting out being kind of like a little bitchier than normal.

My question: At that point, you weren't aware that she had made any allegations of sexual assault?

Your answer: Correct, correct.

Do you recall those questions and answers?

A. Yes.

Q. Then on page 68 starting at line 14, my question, again about [S.C.]: So the disclosure that was made two weeks before she was taken out of your custody, that was the first that was disclosed?

Your answer: That is correct, any kind of detail.

Question: And after she disclosed that, she never backed off that?

Your answer: No. Not that I remember, no.

Do you recall those questions and answers?

A. Yes.

(Emphasis in original.)

The State submits "that jumping directly into Becky's deposition on day 2 was proper as it was related to inconsistencies stated during her day 1 testimony and therefore [trial] counsel was not ineffective for failing to object on the grounds of improper impeachment." We agree. Becky's testimony on day 1 was confusing as to when S.C. told her about the events that occurred between her and Fulton. The State's use of Becky's deposition testimony on day 2 was to clarify the timing of when S.C. told her of the events. We fail to see how Fulton could have been prejudiced by trial counsel's failure to object to the use of deposition testimony to clarify the timing of Becky's knowledge of events. This claim of ineffective assistance of counsel fails.

*(vi) Hearsay*

In assigned error "K," Fulton claims his trial counsel performed deficiently by failing to object to hearsay as to what the children said to their mother and not striking it for the jury. Fulton

argues that "[t]he testimony about what the girls said to their mother was hearsay when asked of Mother," but no objection was made by trial counsel. Brief for appellant at 21. "The State questioned verbatim about the alleged text message the girls sent to their mother" and "[t]he message was instrumental to the State's case as it used the very term of art 'rape' to help bolster the State's case without any meaningful attempt by trial counsel to keep that out." *Id.* Fulton acknowledges that trial counsel objected to the exhibit containing the text message because of a discovery violation, but states "the hearsay contents of the message were already before the jury without any objection and without a request that such testimony be stricken," and such failure "clearly poisoned the jury" to his detriment. *Id.*

Fulton would not be able to establish prejudice by trial counsel's failure to object to the hearsay testimony by Becky. S.C. had already testified that she told her mother "by text" that Fulton "raped" her and "hurt" her, and that her mother acknowledged it. Any additional testimony by Becky about the text message was cumulative. This claim of ineffective assistance of trial counsel fails.

### (vii) Motion for Directed Verdict

In assigned error "M," Fulton claims his trial counsel performed deficiently by failing to file a motion for directed verdict because "[i]t was plainly clear that some essential elements of the crimes charged were not met." Brief for appellant at 23. We have already found that there was sufficient evidence to support Fulton's convictions and therefore he cannot show that trial counsel was deficient or that he was prejudiced by trial counsel's failure to file a motion for directed verdict. This claim of ineffective assistance of counsel fails.

### VI. CONCLUSION

For the reasons stated above, we affirm Fulton's convictions and sentences. We also find the record sufficient to address all of the ineffective assistance of trial counsel claims that were sufficiently raised and conclude that they all fail.

AFFIRMED.